In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-2804 & 10-2389

ESTATE OF NICHOLAS D. RICE,
deceased, by: RICK D. RICE and
DIANE J. WALDROP, co-personal
representatives,

*Plaintiff-Appellant*,

*v.*

CORRECTIONAL MEDICAL
SERVICES, a Missouri corporation, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
Nos. 06 C 697 and 09 C 319—**Robert L. Miller, Jr.**,
and **Rudy Lozano**, *Judges*.

ARGUED DECEMBER 3, 2010—DECIDED MARCH 20, 2012

Before FLAUM, ROVNER, and EVANS*, *Circuit Judges*.

---

* Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

ROVNER, *Circuit Judge.*  Nicholas D. Rice died in the Elkhart County Jail in December 2004, nearly fifteen months after he was booked at the jail pending trial on a charge of attempted bank robbery. Rice was known to suffer from schizophrenia, and shortly before his death a judge had found him incompetent to stand trial. Although he was seen by mental health professionals while he was being detained, Rice frequently refused to take his prescribed medications, cooperate with medical personnel at the jail, eat his meals, or bathe himself. He was briefly hospitalized at psychiatric and other medical facilities on several occasions during the period of his confinement, and at the time of his death he was awaiting placement at a state psychiatric facility pursuant to the judge's finding of incompetence. Rice died as a result of psychogenic polydipsia (excessive water drinking), which is a disorder known to manifest in a minority of persons with schizophrenia. Following Rice's death, his parents, representing his estate (the "Estate"), filed suit in federal court pursuant to 42 U.S.C. § 1983, alleging among other things that jail officials and medical personnel had deprived Rice of due process by exhibiting deliberate indifference to his declining mental and physical condition. The district court entered summary judgment against the Estate on its section 1983 claims, finding in part that correctional and medical personnel had not consciously disregarded Rice's medical needs and that the ultimate cause of his death was not reasonably foreseeable to them. *Estate of Rice ex rel. Rice v. Correctional Med. Servs.*, No. 06 C 697, Opinion & Order, 2009 WL 1748059 (N.D. Ind. June 17, 2009) (Miller, J.). The Estate then filed a

second federal suit, invoking the court's diversity juris-diction, in which it reasserted the state wrongful death claims that the judge in the first suit had dismissed without prejudice after disposing of the federal claims. The judge in the second suit dismissed that case on the basis of collateral estoppel, reasoning that his col-league's finding as to the foreseeability of the cause of Rice's death precluded recovery on any of the state claims. *Estate of Rice ex rel. Rice v. Correctional Med. Servs.*, No. 09 C 319, Order (N.D. Ind. May 17, 2010) (Lozano, J.) (unpublished). The Estate appeals both judgments. On review of the record, we conclude that a material dispute of fact precludes summary judgment on one of the Estate's section 1983 claims: that his conditions of con-finement were inhumane. We also conclude that the district court erred in dismissing his state claims. We therefore affirm in part and reverse in part.

## I.

On March 5, 2003, Rice, then twenty years old, walked into the KeyBank in Nappanee, Indiana, and announced to a teller that he had a bomb that he would detonate if he was not given money. Then, without explanation and without having taken any money, Rice walked out of the bank. He made his way back to his hometown of Stevensville, Michigan, in a car he had stolen that morning from a neighbor. As he drove back into Stevensville, the owner of the car spotted Rice and summoned the police. Rice was jailed in Berrien County, Michigan, on a charge of auto theft.

It soon became apparent to the Michigan authorities that Rice had mental difficulties. Rice had begun to exhibit mental problems while he was in high school, and he was eventually diagnosed as suffering from undifferentiated schizophrenia. Schizophrenia is a chronic mental illness which interferes with a person's ability to accurately perceive what is going on around him, to distinguish fact from fantasy, and to regulate his emotions. Although Rice was prescribed medications for his illness, he did not take them consistently and stopped taking them altogether once he was no longer covered by his parents' health insurance. Not long after he was jailed in Michigan, various physical and mental problems—including weight loss, unresponsiveness, and lack of hygiene—resulted in Rice's hospitalization, a finding that he was not competent to stand trial, and eventually his commitment to the Kalamazoo Psychiatric Hospital for a period of nearly two months. The therapy and medication that Rice received during his commitment resulted in a marked improvement in his condition. His mother would later testify that Rice was in the best condition he had been in for quite some time. By the time Rice was discharged from the psychiatric hospital in late August 2003, Indiana authorities had identified him as the suspect in the KeyBank robbery, and a bench warrant was issued for his arrest. After the Michigan charges against him were resolved, Rice was transferred to the Elkhart County Jail in Indiana, where he was booked on a charge of attempted robbery on September 8, 2003. His bail was set at $20,000.

The Elkhart County Jail had an ongoing contract with Correctional Medical Services ("CMS") to provide comprehensive health care services to inmates of the jail. To serve the general medical needs of the jail's inmate population, CMS provided the jail with a staff which, in 2004, included the equivalent of approximately six full-time licensed practical nurses, one full-time registered nurse, one half-time social worker, and a physician who served as the jail's medical director. CMS in turn contracted with Oaklawn Psychiatric Center in Goshen, Indiana, to provide psychiatric services to jail inmates as needed. Pursuant to that contract, mental health treatment decisions were reserved to Oaklawn and one of its physicians, Dr. Bryce B. Rohrer. Rohrer is board-certified in family medicine rather than psychiatry, but he has practiced family psychiatry for many years (his specialty is drug and alcohol addiction), and by the time of Rice's detention he had been providing psychiatric services to the jail for the previous ten years. Rohrer generally spent one-half day per week at the jail.

The CMS medical personnel who performed a screening upon Rice's arrival at the jail had access to his medical records and were aware of his psychiatric history and the psychotropic medications he had been prescribed for his schizophrenia. Dr. Rohrer met with Rice two days after he was booked into the jail and wrote him a prescription for Seroquel, an anti-psychotic medication that he had been taking prior to his transfer from Michigan. When Rohrer examined Rice several weeks later, Rice had been placed in the jail's "tank" because he was not communicating. Rohrer's notes indicate that Rice was not taking his prescribed medication but was practicing self-

care. Rohrer was not sure if he was eating. Rohrer con-
cluded that Rice's behavior was likely explained by
psychosis, a traumatic event, or malingering (i.e., feigning
illness for secondary gain) and noted his intent to hos-
pitalize Rice at Oaklawn if further observation revealed
that Rice was not eating or was outwardly psychotic.

In late October, Rohrer petitioned an Indiana state
court to involuntarily commit Rice to a mental facility
for a period of seventy-two hours, explaining that Rice
was "refusing psychotropic medication and refusing to
eat, refusing to communicate most of [the] time, diagnosed
as schizophrenic." R. 198-70 at 3. The court granted the
petition, and Rice was admitted to Oaklawn. He was
given an intramuscular injection of Haldol, a psycho-
tropic medication, upon his arrival at Oaklawn, but his
treating physician there, Dr. Salvador Ceniceros, who is
board-certified in both psychiatry and neurology, con-
cluded in short order that there was no probable cause
to believe that Rice met the criteria for involuntary com-
mitment or forced medication. Ceniceros would later
testify that Rice showed no signs of psychosis, answered
his questions plainly and coherently, interacted with
others appropriately, was eating and drinking, and ac-
cepted medication voluntarily. At Ceniceros' instruction,
Rice was discharged back to the jail less than twenty-four
hours after he was admitted.[1]

---

[1] Subsequently, in December 2003, Ceniceros was asked to
evaluate Rice's competency to stand trial. He concluded that
Rice was competent.

In the following months, Rice continued to exhibit the sort of behavior at the jail which had led Rohrer to seek his involuntary commitment to Oaklawn in October. Rohrer's notes from November 2003 and January 2004 indicated that although at times Rice was communicative and appeared to be doing better, at other times he was refusing to take his medication and uncommunicative and that his psychotic disorder appeared to be worsening.

On November 16, 2003, Rice struck his cellmate in the eye, causing the cellmate to seek medical attention. When Rice subsequently refused an instruction by the correctional staff to step out of the cell, Officer Jennifer Shelton directed her colleague, Jason Koontz, to spray Rice's face with pepper foam, and Rice was then placed in a restraint chair. Nurses Cindy Lambright and Joy Bell were present when Rice was pepper-sprayed, and they helped rinse his face and eyes. Rice later refused multiple invitations to leave the restraint chair and remained there for a period of over eighteen hours. Ultimately he was dragged from the chair and into a cell by jail staff.

In mid-November, Rohrer ordered the nursing staff to administer an intramuscular injection of Haldol to Rice every four weeks provided that he did not object. One such shot was given to Rice, in early December. Rice subsequently asked Rohrer to put him back on Seroquel instead, and Rohrer acceded. But in January 2004, Rohrer noted that Rice was again uncommunicative and sometimes refused to take his medication. Rohrer increased

Rice's prescribed dosage of Seroquel and directed that he be returned to Haldol injections if he refused to take the Seroquel.

Rohrer did not see Rice from February 10—when Rice was again refusing his medication, and Rohrer had to visit Rice in his cell because Rice otherwise refused to see Rohrer—until May 11, 2004. During that time, the nursing staff saw him regularly and observed more of the same behavior that Rohrer himself had documented previously. Nurse Lambright noted in February that Rice refused to take his medications or to wear clothing. His continuing refusal to take medications became a frequent refrain in the subsequent notations of the jail's medical staff.

By April, jail officials, in apparent recognition of the particular challenges that Rice presented, were requesting that his condition and behavior be thoroughly documented. That month, Captain Brad Rogers, the jail's commander, asked that he be updated on Rice's status at the jail. In response to that request, Nurse Rebecca Hess, a regional manager for CMS who supervised nurses at both the Elkhart County Jail and other facilities, wrote a one-page memorandum to Rogers and Lieutenant Fred Call, the jail's warden, concisely summarizing Rice's history at the jail. Hess noted that efforts had been made to monitor Rice's weight beginning in December 2003 due to his periodic refusal to eat. She added that there had been no significant changes in Rice's weight since that time, although he frequently refused to be weighed. Rice also continued to refuse his medica-

tions and often refused to see Rohrer. In addition, he refused to leave his cell for visits with family or with his attorney. On April 15, Call emailed a memorandum to the jail's supervisory staff directing that all out-of-the ordinary occurrences involving Rice be videotaped and or reported, both to document Rice's behavior on these occasions and to assist his attorney in taking appropriate action. "I'm attempting to work with the public defender office to show this person m[a]y need . . . help. . . . So I would appreciate your reports. The sooner we can get this individual help the better off for all of us." R. 198-80 at 20. As a result of that directive, the record includes video recordings of several instances in the ensuing months in which jail staff forcibly removed Rice from his cell and showered him.

By the end of April, Rice's condition appears to have deteriorated further. In an April 30 note, Lambright reported that officers had to physically remove Rice from his cell during a "shake down" when he refused to leave the cell on his own. Lambright noted that Rice was unable to stand, that his entire body was jaundiced, that he had a large, three-inch area of dark skin over his coccyx, and that when officers picked him up, dead skin cells sloughed off his body in large numbers. He refused to speak. Rice repeatedly refused to see his parents when they came to the jail.

Dr. Paul J. Yoder, a psychologist at Oaklawn, evaluated Rice on April 28, 2004, at the request of Rice's attorney. Based on Rice's catatonic and unresponsive behavior, Rice's counsel was concerned that he was not able to

assist in his defense, notwithstanding the prior findings by two psychiatrists (including Ceniceros) that Rice was competent to stand trial. Rice was largely unresponsive when Yoder interviewed him. It was clear to Yoder that Rice suffered from schizophrenia, and that Rice's functioning improved when he took his medications and worsened when he did not. In his report of May 4, 2004, Yoder considered whether the catatonia Rice displayed might be due to malingering rather than to his mental illness. There were reports from the jail suggesting that Rice altered his behavior depending on whether or not he was being observed. Rice might be feigning catatonia in the hope that he could avoid trial or be found not guilty by reason of insanity, Yoder posited. "However, given Nicholas' documented history of poor functioning and poor insight when not being treated, this seems very unlikely as a motivating factor for his current behavior." R. 198-127 at 7-8. Yoder considered other potential motives for Rice to pretend he was more ill than he was, but ultimately was skeptical of the notion that Rice was intentionally and genuinely malingering. He pointed out that the overt symptoms of schizophrenia can wax and wane even when one is not being treated. "Regardless [of] [Rice's] actual motive and whether or not he is aware of it, it does not appear that he is engaged in this type of malingering behavior when his illness is being effectively treated. As a result, it is my opinion that the malingering is itself the product of his mental illness." R. 198-127 at 8. Yoder therefore concluded that Rice was not competent to assist his attorney with his defense. "The record is clear that Nicholas

is severely mentally ill." R. 198-127 at 8. Yoder recommended that the court consider ordering Rice's compliance with psychiatric treatment (i.e., that he be forcibly medicated), and noted that given how well Rice responded to involuntary treatment in Michigan, it was likely that Rice's symptoms would remit within four to six weeks. "At that point it should be possible to more clearly distinguish between symptoms of schizophrenia and ongoing malingering." R. 198-127 at 8.

On May 11, Rohrer concluded that Rice should again be committed to a psychiatric facility for observation and evaluation for the possibility of involuntary medication. Rohrer's notes indicate that Rice was refusing to see him, refusing his medications, did not communicate, did not practice self-care, ate only junk food in lieu of regular meals, and appeared to be developing bedsores. In his petition to the court for an order of involuntary commitment and forced medication, Rohrer noted that Rice was "psychotic" and "unable to perform self-care." R. 192-9 at 47. The court granted the petition.

Rice was transferred to Oaklawn that same day. On arrival at the facility, he was catatonic and had to be lifted out of the transport van. However, once again his behavior appears to have changed dramatically following his arrival at the hospital. Ceniceros noted that Rice was cooperating, showering, eating, drinking and agreeing to take his prescribed medication. Ceniceros surmised that Rice was malingering in order to get out of jail, and he again concluded that there was "no probable cause to believe that [Rice] meets the criteria for

involuntary commitment." R. 192-9 at 50. He diag-
nosed Rice with undifferentiated schizophrenia and/or
malingering, and for the second time discharged Rice
back to the jail less than twenty-four hours after he
was committed. His discharge notes concluded with the
following observations: "This morning [Rice] is alert,
cooperative, and oriented x 3. He denies any current
suicidal or homicidal ideation. Thoughts are linear and
goal directed. . . . He also denies hallucination in all
five senses. There is no looseness of association or flight
of ideas noted. Intelligence appears to be average based
on fund of knowledge and vocabulary; judgment and
insight appear [to be] intact. . . ." R. 198-145 at 16.

Shortly after his return to the jail, Rice was placed in
the administrative segregation unit, known as Ward
One, where he could be observed more closely. Previously
Rice had been housed in the medical ward as well as
other areas of the jail, but according to Rogers, medical
personnel at the jail had asked that Rice not be returned
to the medical ward given his poor hygiene and con-
duct. In Ward One, he was assigned to cell number 5A,
which we are told was the cell most easily viewed from
the first-floor control room across from Ward One.
Because the cells in Ward One were single-occupancy
units, Rice had no cellmate. He was allowed out of the
cell one hour per day. Rice remained in the administra-
tive segregation unit until his death seven months later.

In June 2004, an Indiana circuit court judge found that
Rice was competent to stand trial on the bank robbery
charge. At the invitation of and with the agreement of

the parties, the judge made that finding without a hearing and based solely on his review of the written reports of the three professionals (including Ceniceros and Yoder) who had evaluated Rice.

> After examining all reports the Court finds the Defendant to be competent to assist his counsel and further notes that the Defendant was able to converse with the presiding judge in open court and express himself and answer questions appropriately. The Court further notes that Paul J. Yoder's written report indicates there is some reasonable belief that this Defendant may be faking his catatonic state since he was reported to sleep on a top bunk and the officers did not put him there. Additionally, he has been seen out of his cell on a number [of] occasions and as soon as he spots an officer he freezes and becomes unresponsive. The Court notes that he was responsive in open court and appeared to be well-oriented on the date of hearing herein (June 10, 2004).

R. 198-51 at 2-3. The court set Rice's case for trial on December 6, 2004.

Despite the competency finding, Rice continued to exhibit abnormal behavior at the jail:

– Captain Rogers would later testify that by June, "I think we were all concerned about his mental capacity . . . ." R. 198-20 at 18, Rogers Dep. 109.

– On June 25, 2004, another inmate assaulted Rice in his cell by poking him in the groin with a broomstick through the bars of his cell door. Rather than move

in order to avoid the broomstick, Rice simply stood in place, catatonic, while he was assaulted. The attack left visible welts on his back, buttocks, and side.

– On August 2, 2004, Rice cut his neck with a disposable razor from which he had bent or broken off the plastic guard in order to expose a portion of the blade. Lambright, on being summoned to Rice's cell, found him holding a towel over the wound. The one-inch laceration, although located over his carotid artery, was superficial. Rice later told Nurse Sharrone Jones, who became the jail's charge nurse in 2004, "I just hurt myself," R. 198-37 at 26, and when asked why by Nurse Lambright, he remarked "I just felt like it," R. 198-14 at 11. He was taken to Goshen General Hospital for treatment and the wound was sutured. Rice denied any effort to commit suicide, and the physician who treated him in the hospital's emergency room, Dr. David E. Van Ryn, agreed that he was not genuinely suicidal. Upon being returned to the jail, Rice was placed in a restraint chair for a period of eighteen hours, evidently to ensure that he would not harm himself again. When Rohrer met with Rice the following day, Rice told him, "I won't talk to you. I'm not psycho." R. 198-37 at 27. Rohrer indicated in his notes that he thought Rice might be malingering. After investigating the incident, Nurse Hess concluded that Rice had not attempted to kill himself. Given that conclusion, neither CMS nor the jail followed their suicide prevention policies by placing Rice under heightened observation.

– Shortly after this incident, Rice experienced a dizzy spell and hit his head on his cell door, resulting in a one-inch laceration between his eyes. CMS personnel treated the wound, but other than lab work, no additional action was taken.

– Rice's abysmal lack of hygiene continued. On August 18, 2004, Lieutenant Call emailed several jail staff members indicating that "[i]t's time for Mr. Rice to get another shower and have his room cleaned." R. 198-122 at 2. When correctional officer Stephanie Snyder emailed later that day to report that "[i]t was a very dirty job but we accomplished it," R. 198-122 at 2, Captain Rogers replied to thank the officers involved. "A person has to feel some empathy toward someone like Nick Rice, who has to be in such a pathetic state of mind to allow himself to get into such a dirty physical state and to behave as he does." R. 198-122 at 2.

During this time period, Rice was not eating regular meals. In July 2004, Rogers emailed a memorandum to the jail's supervisory officers instructing them to be more proactive in ensuring that food was made available to inmates like Rice (whom he cited by name) who exhibited a reluctance to eat. He admonished staff not to construe an inmate's silence at meal distribution times as a refusal to eat. He also directed that food be left inside rather than outside of an inmate's cell, noting that "[i]f the meal is left inside, Rice will typically eat it." R. 98-118 at 2.

By the Fall of 2004, however, Rice's weight had dropped significantly. A video of him being showered

on September 30 reveals him to have been quite thin, if not gaunt. As of the beginning of October, Rice, who was six feet, two inches tall, weighed just 132 pounds, some fifty pounds less than he did at the time of his admission in 2003. A nurse noted the presence of a sore or sores on his hips. On October 5, Rohrer noted that Rice had lost a significant amount of weight, was still refusing to eat or to take medication, appeared to be exhibiting the early onset of bedsores, and required medical attention.

For the third and final time, Rohrer sought Rice's involuntary commitment to an inpatient psychiatric facility for additional care. In support of the petition, Rohrer wrote that "[Rice] is seriously medically [and] psychiatr[ically] ill and needs intensive medical care as well as [the] availability of psychiatric care." R. 192-9 at 56. "Oaklawn Hosp[ital] would not be able to provide the intensive medical care," he added. R. 192-9 at 56. Rohrer explained that in addition to having serious psychiatric difficulties, Rice was "dying from malnourishment." R. 192-9 at 54. The court granted another seventy-two hour commitment. The order identified four hospitals at which Rice could be placed, in the discretion of the Sheriff: Oaklawn, Goshen General Hospital, Bowen Center, and Elkhart General Hospital for Behavioral Medicine ("Elkhart General"). R. 192-9 at 57.

Rohrer had requested that Rice be committed to a hospital where psychiatric care was available, and it was Rohrer's intent that he be taken to Elkhart General, which had an inpatient psychiatric unit. However, that

hospital refused Rice's admission in the mistaken belief that it did not have a contract with the jail.

Instead, Rice was taken to Goshen General Hospital, which unlike Elkhart General had no psychiatric unit. He was admitted and observed by Dr. Allison P. Mathew, who found him to be suffering from symptoms of dehydration and mild malnutrition. After rehydrating Rice and encouraging him to eat, Dr. Mathew concluded that he had been medically stabilized. She assumed that upon discharge, he would be "sent back to Oaklawn for further psychiatric evaluation and management." R. 198-45 at 27. But when she consulted by telephone the following morning with Dr. Ceniceros at Oaklawn, he opined in light of what Dr. Mathew told him that Rice did not pose an imminent danger to himself or others. According to Mathew, Ceniceros added that he would not accept Rice for admission to Oaklawn in view of his previous conclusion that Rice was malingering, although Ceniceros denies that he said this. Dr. Mathew discharged Rice back to the jail on October 6 with instructions that he be encouraged to eat, given high protein shakes if he would take them, continue on his current medications, and follow up with the Oaklawn psychiatrist (presumably Rohrer) within a week.

Upon Rice's return to the jail, CMS staff made various efforts to improve Rice's nutrition and more generally to convince him to eat more food. Nurse Jones instructed the jail's food service to provide Rice with high-protein Resource® Health Shakes twice daily, along with two milks at all meals and extra juice for breakfast. When

the jail's medical director, Dr. Alan Bierlein, assessed Rice on October 25, he issued a second order that Rice be provided with extra food. It appears that there was some delay in obtaining high-protein shakes and that Rice initially was provided with Carnation® Instant Breakfast drinks in lieu of the prescribed protein shakes, but otherwise he was provided with extra food by the jail's food service as instructed. In addition, there is evidence that CMS nurses saw Rice several times daily following his return from the hospital. As they had since his weight loss was first noted, the nurses brought him extra snacks, encouraged him to eat, and urged him to take his medications. These efforts met with mixed results. Rice continued to refuse many of his meals. On the other hand, he frequently did eat his breakfast, and the record indicates that Rice did not lose additional weight following his return to the jail. And in marked contrast to his typically reclusive and unresponsive behavior, Rice just three days before his death walked out of his cell and showered himself when invited to do so.

Other problems persisted, however. Rice regularly refused to take his medication. He was often uncommunicative. He typically did not bathe himself or otherwise attend to his own hygiene. Joshua Shaw, an inmate who was housed in the cell next to Rice, indicated that Rice was "always naked, he had unbelievable odor due to his total lack of hygiene, feces on his body, urine through out his cell, also rotting, uneaten food strewn through out his cell." According to Shaw, Rice rarely spoke, other than to mumble "go away, go away, go away, go away." R. 277-105 at 3.

When Rohrer saw Rice on November 9, 2004, he wrote: "Refuses to communicate and closes his eyes. Is observed at times getting up [and] eating [and] can run through [the] unit (did this recently), but refuses all help [and] has to practically be carried to get shower by staff. Uncompt. caked feces, refusing all meds. " R. 198-37 at 34. Rohrer ordered the nurses to discontinue Rice's anti-psychotic medications (which he was not taking) and to ask him weekly whether he would resume taking them. Rohrer planned to see him again in a month.

On December 6, 2004, the judge presiding over Rice's criminal case reversed his earlier competency assessment and found Rice incompetent to stand trial. The judge committed Rice to the custody of the Indiana Division of Mental Health and ordered Sheriff Michael E. Books to deliver Rice to a facility designated by the Division. The Division in turn designated the Logansport State Hospital, a psychiatric facility, which accepted Rice for admission. However, because there was no bed available at that time, Rice remained at the jail until space opened up. Unfortunately, Rice died before that happened.

Late in the evening of December 17, 2004, inmate Shaw heard Rice gulping water and vomiting in his cell. In the ensuing hours, Shaw and other inmates in the administrative segregation unit "mule-kicked" their cell doors in an effort to get someone's attention, but according to Shaw's account, no one ever responded. Jail policy required the guards to conduct hourly checks of all inmates in the administrative segregation unit, but crediting Shaw's account, one may infer that neither

a guard nor anyone else on duty in the overnight hours ever checked on Rice.

At approximately 4:30 a.m. on December 18. Rice was found dead in his cell. A frothy pink discharge was noted near his mouth. Autopsies would later reveal that Rice died of acute cardiac arrhythmia triggered by a lethal decline in the sodium level in his blood, which was in turn caused by his excessive consumption of water in the hours prior to his death.

Psychogenic polydipsia, a disorder characterized by excessive thirst and compulsive water drinking, is a poorly understood phenomenon that occurs in between six and twenty percent of patients with psychiatric disorders, and most commonly is seen in patients with schizophrenia. Brian Dundas, M.D., Melissa Harris, B.S., and Meera Narasimhan, M.D., *Psychogenic Polydipsia Review: Etiology, Differential, and Treatment*, 9 CURRENT PSYCHIATRY REPORTS 236, 236 (2007). It is undisputed in this case that the disorder can occur both in individuals who are taking medication for their schizophrenia and those who are not, and that unless an individual has previously experienced a bout of psychogenic polydipsia, there are no known warning signs that enable medical professionals to predict whether or when he or she will ever suffer from this disorder. How great the risk is that a schizophrenic individual suffering from psychogenic polydipsia will in turn experience hyponatremia, sometimes described colloquially as "water toxicity," is a matter of dispute on the record in this case. Dr. John Pless, a forensic pathologist who

offered evidence on behalf of the defense, wrote in his report that inappropriate hormone secretion, which causes a compulsive water drinker to retain water and excrete electrolytes, thus causing one's blood sodium level to drop, is "commonly seen" in people with schizophrenia. R. 169-5 at 2. Although he tried to withdraw that statement in a subsequent affidavit (in which he asserted that the phenomenon is "exceedingly rare," R. 281-10 at 3 ¶ 20, and that the odds of death due to excessive water intake were one in a million, R. 281-10 at 3 ¶ 21), the district court excluded the retraction from evidence. Our research indicates that of all those individuals who do experience psychogenic polydipsia, only ten to twenty percent experience hyponatremia as a result of their compulsive water drinking. *Psychogenic Polydipsia Review*, 9 CURRENT PSYCHIATRY REPORTS at 236.

The autopsies also support the conclusion that Rice was to some degree underweight and malnourished (the parties' experts differ as to the degree) at the time of his death. Defense expert Dr. Daniel Scherb indicated that Rice's recorded weight at death was seventy-five to eighty percent of what would be ideal. Although at least one expert for the Estate opined that malnutrition played a role in Rice's death, others found no evidence that this was true, and based on the arguments that the parties made on summary judgment, the district court found there to be no dispute that Rice died as a result of compulsive water drinking rather than malnutrition. 2009 WL 1748059, at *5 & n.5. The Estate does not quarrel with this finding on appeal.

The Estate brought this suit under 42 U.S.C. § 1983 against jail officials (in both their official and individual capacities), jail guards, CMS and Oaklawn, CMS nurses who worked at the Elkhart County jail, and Drs. Rohrer and Ceniceros, among others. The Estate contended that jail officials and staff had subjected Rice to inhumane conditions of confinement, used excessive force against him, failed to protect him from harm inflicted by other inmates, employed policies and customs that reflected institutional indifference to the constitutional right of a mentally ill inmate to adequate medical (including psychiatric) care and protection from self-inflicted harm, and individually displayed deliberate indifference to his well-being. The Estate alleged that CMS and Oaklawn also followed policies and customs that reflected deliberate indifference to the plight of mentally ill inmates who lack the ability to care for themselves. The nurses employed by CMS to care for inmates at the jail were alleged to have manifested deliberate indifference to Rice's declining health and self-destructive tendencies. The Estate charged Drs. Rohrer and Ceniceros with deliberate indifference to Rice's need for more intensive and proactive psychiatric treatment than he could obtain at the jail. In addition to the federal claims, the Estate asserted wrongful death claims under Indiana law against all defendants.

Following two years of extensive discovery, the defendants moved for summary judgment. Judge Miller granted their motions as to each of the section 1983 claims. We shall discuss the particular allegations underlying these claims, and the grounds on which the court

entered summary judgment, as we address each claim in turn below. As we have noted, the court also relinquished jurisdiction over the wrongful death claims premised on state law. When the Estate subsequently refiled the wrongful death claims—now limited to the CMS defendants alone—in federal court, Judge Lozano dismissed them on the basis of Judge Miller's determination that the particular cause of Rice's death was not reasonably foreseeable to the defendants.

## II.

### A.  CONDITIONS OF CONFINEMENT

The Estate contends that owing to the deliberate indifference of jail officials and staff, from Sheriff Books on down to the guards, Rice's conditions of confinement were inhumane. In particular, the Estate alleges that his cell was often filthy and unsanitary, that uneaten food was left to rot there, that his skin was sometimes caked with his own feces, that he had an extremely foul body odor owing to the long periods of time during which he went unbathed, and that he either developed or was on the verge of developing bedsores on multiple occasions (although apparently these were healing at the time of his death). Although there may be unresolved questions as to how often and for how long these conditions occurred, there is no genuine dispute that they did in fact occur. They are documented not only in the declaration from inmate Joshua Shaw, who was housed in the administrative segregation unit in the cell next to Rice's, but also in various notations and memoranda

written by Dr. Rohrer, the nursing staff, and jail officials, and to some extent in the video recordings of the instances in 2004 in which Rice was removed from his cell and showered by jail staff. Nor is there any mystery as to why these conditions occurred: Rice typically refused to shower or perform any sort of self-care whatsoever, left much of the food delivered to his cell untouched, and lay naked and unmoving on his bunk for most of the time. The record (including the videos) reveals that the jail did intervene on occasion to clean both Rice and his cell (there is some evidence that Rice was eventually showered on a weekly basis, although neither the jail's shower log nor the videos confirm this), but the gist of the Estate's claim is that there were significant periods of time during which the jail's staff members simply turned their back on the condition of Rice's person and cell, knowing that he was living in his own filth.

Incarcerated persons are entitled to confinement under humane conditions which provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981); *see also Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994); *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480-81 (1993); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) (prison has duty to provide, inter alia, adequate sanitation and hygienic materials); *Board v. Farnham*, 394 F.3d 469, 482-83 (7th Cir. 2005) (personal hygiene items). Because Rice was a pretrial detainee, it is the due process clause of the Fourteenth Amendment rather than the Eighth Amendment's proscription against cruel and unusual punishment which

is the source of this right. *See Bell v. Wolfish*, 441 U.S. 520, 535-37, 99 S. Ct. 1861, 1872-73 (1979). However, courts still look to Eighth Amendment case law in addressing the claims of pretrial detainees, given that the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth Amendment affords to convicted prisoners, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983 (1983); *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005); *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998), and the Supreme Court has not yet determined just how much additional protection the Fourteenth Amendment gives to pretrial detainees. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 n.5 (3d Cir. 2005); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 259 n.1 (7th Cir. 1996); s*ee also Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) ("there is little practical difference between the two standards"). A claim that the conditions of an inmate's confinement were constitutionally inadequate proceeds through a two-step inquiry. We consider first whether the adverse conditions complained of were "sufficiently serious," such that the acts or omissions of prison officials giving rise to these conditions deprived the prisoner of a "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977; *Chapman*, 452 U.S. at 347, 101 S. Ct. at 2399. If the answer to that question is yes, we consider whether prison officials were deliberately indifferent to the adverse conditions. *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977; *Wilson v. Seiter*, 501 U.S. 294, 302-04, 111 S. Ct. 2321, 2326-27 (1991). An official is deliberately indif-

ferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it. *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).

The district court disposed of this claim largely on the ground that Rice himself created the unsanitary conditions. The jail did not prevent Rice from showering or keeping his cell clean and, on occasion, showered him and cleaned out his cell for him. In the court's view, this is what distinguished the instant case from *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (per curiam), in which we held that assigning an inmate to a cell in which, inter alia, feces and blood covered the wall, presented a triable issue of fact as to whether he was deliberately deprived of his Eighth Amendment right to incarceration in humane conditions. Here, by contrast, "[t]he conditions Mr. Rice endured were self-inflicted and don't give rise to a claim of deliberate indifference." 2009 WL 1748059, at *11 (citing *Isby v. Clark*, 100 F.3d 502, 505-06 (7th Cir. 1996) (noting that if the inmate is the cause of the conditions of which he complains, his Eighth Amendment claim is tenuous)). The court did acknowledge that "Mr. Rice's behavior was driven by his mental illness," but chose to account for that factor in considering his need for mental health treatment rather than whether jail officials were deliberately indifferent to the conditions of his confinement. *Id.* The court also added, somewhat more cryptically, that "[u]nder the circumstances of this case, Mr. Rice's unsani-

tary condition wasn't sufficiently serious to constitute a constitutional violation. Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.*

We conclude, contrary to the district court, that whether jail officials were deliberately indifferent to Rice's conditions of confinement presents a material dispute of fact that the factfinder must resolve at trial. That Rice himself created the unsanitary conditions of which his Estate complains certainly is a fact relevant to this claim, as our decision in *Isby* makes clear. 100 F.3d at 505-06. But given Rice's mental condition, it by no means forecloses the claim, as the district court appears to have assumed. As we noted in *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006), and *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992), prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies. There is evidence that Rice may have been malingering, and it is possible that a factfinder might conclude that Rice's failure of self-care was knowing, voluntary, and deliberate rather than the product of his mental illness. But there is also a wealth of evidence in the record that would support a contrary finding that Rice truly became incapable of caring for himself as a result of his schizophrenia and that jail officials were well aware of this. In light of that evidence, a factfinder reasonably could conclude that Rice was not responsible for the conditions of his cell and his person, and that prison officials, who were aware of these conditions and of Rice's illness, were responsible

for them in the sense that they did not make more conscientious efforts to bathe Rice and to clean his cell. No doubt Rice's behavior placed the jail in a difficult position; and a factfinder might conclude that even if jail officials could have done more, they were not deliberately indifferent to the cleanliness of Rice's person and cell. For example, the record does confirm that jail staff did shower Rice and clean out his cell on multiple occasions. However, in view of evidence suggesting that uneaten food was allowed to accumulate in Rice's cell, that he went for long periods without being showered, and that the stench of his cell and his person were overwhelming, this claim cannot be resolved on summary judgment.

For the same reasons, we cannot sustain the district court's alternative conclusion that the conditions of Rice's confinement were not sufficiently serious to support his Fourteenth Amendment claim. Perhaps a factfinder could reach that conclusion. As the district court noted, prison conditions may be uncomfortable, even harsh, without being inhumane. *See Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976. But on this record, granting the Estate the benefit of all inferences to which it is entitled on summary judgment, a factfinder reasonably could conclude that the conditions of Rice's confinement exceeded mere discomfort and were constitutionally unacceptable. *See, e.g., Gillis*, 468 F.3d at 493-94 (evidence that prisoner was stripped naked and placed in cell without, inter alia, adequate sanitation sufficient to survive summary judgment); *Vinning-El v. Long, supra*, 482 F.3d at 924 (holding defendants were not entitled to qualified immunity on Eighth Amendment claim that

inmate was subjected to unsanitary and otherwise inhumane confinement for period of three to six days) (coll. cases).

## B.   ADMINISTRATIVE SEGREGATION

The Estate has a separate conditions-of-confinement claim relating to Rice's prolonged assignment to Ward One, the administrative segregation unit of the jail. The record indicates that Rice was housed in that unit for approximately seven months, from mid-May, 2004, until his death the following December. Ostensibly, he was assigned to that unit so that he could be more readily monitored and because his behavior made his assignment elsewhere in the jail problematic. (None of the briefs in this case, unfortunately, discuss with any particularity the nature of this jail's administrative segregation unit and what types of inmates were housed there.) One of the Estate's experts, Dr. Joe Goldenson, opined that Rice should have been in placed in the jail's medical ward, where he had been placed on previous occasions, instead of administrative segregation, because "[i]t is a well established fact that individuals with psychiatric problems decompensate when they are in extreme isolation." R. 157-2 at 18 ¶ 7.

We may make short work of this claim because, as the district court noted, the Estate has provided "little support" for it. 2009 WL 1748059, at *12. Dr. Goldenson's analysis certainly suggests that a prolonged placement in segregation might have adverse effects on someone

in Rice's condition; and our own decision in *Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994), recognizes that prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment (and therefore the Fourteenth), depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement. (We note, however, that the claim in *Walker* also included allegations that the inmate had been denied water for periods of up to one week, had been given inadequate time to exercise, and had been subject to physical abuse.) But the Estate has not discussed in any detail what alternative placements were available to the jail nor, more importantly, has it documented the differences those placements would have made in terms of Rice's social isolation. We take it as a given that the Estate does not believe he should have been placed in the general population of the jail, as its other claims are premised on the notion that Rice should have been monitored more rather than less closely than he was—and it is undisputed that he was placed in administrative segregation for that very purpose. Rice had been placed in the medical ward on prior occasions, and presumably had he been assigned to that ward rather than to administrative segregation he would have received as much if not more medical attention than he did in segregation. But the record suggests that Rice was not returned to the medical ward at the request of the jail's medical staff. It also indicates that Rice had daily contact with medical personnel in administrative segregation. More to the point, the Estate does not ex-

plain why placement in the medical ward or any other unit of the jail would have reduced the likelihood of decompensation due to isolation. All we know is that Rice had one hour each day to mingle with other prisoners while he was housed in administrative segregation (which the record indicates he often declined); we do not know what additional opportunities for social interaction he would have had in other feasible placements within the jail. It is not too much to expect the Estate's lawyers, when complaining about the debilitating effects of the jail's housing decisions, to identify feasible alternatives and to tender evidence supporting the contention that Rice likely would have fared better in one of those alternative placements. This they have not done.

## C.  EXCESSIVE FORCE

As we noted in our factual summary, on November 16, 2003, Rice struck his cellmate in the eye. When correctional officers ordered him out of the cell, he did not comply and remained standing in his cell. Officer Koontz, at the direction of Officer Shelton, sprayed pepper foam into Rice's face in an effort to secure Rice's compliance with their orders. Rice was then placed in a restraint chair. Nursing staff helped rinse the pepper foam from Rice's eyes. After some period of time, jail staff attempted to release Rice from the restraint chair, but Rice was unwilling to leave the chair and ultimately remained there for a total of eighteen hours. The Estate contends that the use of the pepper foam, along with

his prolonged confinement in the restraint chair,
amounted to excessive force.[2]

The use of force qualifies as excessive for the purpose
of Eighth Amendment and due process jurisprudence
when it entails the "'unnecessary and wanton infliction
of pain.'" *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct.
1078, 1084 (1986) (quoting *Ingraham v. Wright*, 430 U.S.
651, 670, 97 S. Ct. 1401, 1412 (1977)). That the degree
of force used appears in retrospect to have been unrea-
sonable is not sufficient to establish a constitutional
violation. *Id.* at 319, 106 S. Ct. at 1084. Where, as here,
force is employed in the course of resolving a disturb-
ance, the pertinent inquiry is "'whether force was ap-
plied in a good faith effort to maintain or restore disci-
pline or maliciously and sadistically for the very pur-
pose of causing harm.'" *Id*. at 320-21, 106 S. Ct. at 1085
(quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)
(Friendly, J.)). Factors relevant to that inquiry include
whether jail officials perceived a threat to their safety
and the safety of other inmates, whether there was a
genuine need for the application of force, whether the
force used was commensurate with the need for force,
the extent of any injury inflicted, and whatever efforts
the officers made to temper the severity of the force

---

[2] Rice was also placed in a restraint chair and left there for a
similarly prolonged period of time on August 2, 2004, after he
cut his neck with a razor and received treatment at Goshen
General Hospital for the injury. But the Estate does not cite
this incident in connection with its excessive force claim.

they used. *Id.* at 321, 106 S. Ct. at 1085. *See also Forrest v. Prine*, 620 F.3d 739, 744-75 (7th Cir. 2010); *Lewis v. Downey*, 581 F.3d 467, 475-77 (7th Cir. 2009).

The district court characterized the force employed by jail officials on this occasion not as excessive, but as "justified and restrained," applied in good faith, and resulting in no significant injury to Rice, 2009 WL 1748059, at *13, and the Estate's cursory treatment of this claim on appeal has not convinced us that the court erred in its analysis. Although the Estate contends that Rice posed no threat to anyone, it does not dispute either that Rice had been fighting with his cellmate or that he failed to comply with the directive that he step out of his cell. A fight among two inmates certainly poses a danger to the inmates involved as well as the jail officials who must intervene to stop it. Rice's mental illness may explain why he stood unmoving when ordered out of the cell, as the Estate suggests, but the Estate cites no evidence showing that the officer who sprayed Rice's face with pepper foam appreciated that he was unable, as opposed to unwilling, to comply with the order and employed the pepper spray maliciously rather than in a good faith effort to restore order. The same is true as to the decision to place Rice in a restraint chair. The Estate contends in passing that jail officials violated multiple internal rules in deploying pepper spray, treating Rice for the effects of that spray, and then leaving him in the restraint chair for hours on end, but fails to discuss the relevant rules and how specifically they were violated. That Rice was left in the chair for eighteen hours does give one pause. Yet, it is undisputed

that Rice himself refused to leave the chair when invited to do so. This too may have been due to Rice's mental illness, and to the extent jail officials and/or CMS nurses recognized this possibility, they may have had some obligation not to leave him in the chair. But removing Rice from the chair against his will itself required the use of force (recall that Rice ultimately had to be dragged from the chair), so the nurses along with the guards were in a damned-if-you-do, damned-if-you-don't situation. The Estate does not identify what alternative steps jail officials should have taken, let alone discuss why their actions would enable a jury to find that they acted maliciously and sadistically as opposed to negligently or reasonably. The district court appropriately entered summary judgment against the Estate on this claim.

### D. FAILURE TO PROTECT

The Estate next argues that the district court erred in granting summary judgment as to its claim that the jail failed to protect Rice from assaults by other inmates. The claim is based on two incidents: (1) the just-discussed November 16, 2003, incident in which Rice fought with his cellmate, and (2) the incident on June 25, 2004, in which inmate Montie George poked a broomstick through the bars of Rice's cell and repeatedly struck Rice in the groin area, resulting in visible welts on his body. The district court in its ruling discussed only the second of these two incidents, concluding that summary judgment was warranted because there was no evidence that either the jail or for that matter Rice expected the

attack, which the court described as a "random" one. 2009 WL 1748059, at *14.

Jail officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan, supra*, 511 U.S. at 833, 114 S. Ct. at 1976-77. They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758-59 (7th Cir. 2010).

The evidence in this case would not support a finding that jail officials were aware of but did not appropriately respond to a substantial risk that Rice might be assaulted. We know little about the first incident in 2003 other than that Rice struck his cellmate. The defendants represent that Rice actually instigated that fight; but even if he did not, the Estate points to no evidence suggesting that the jail was on notice of the possibility that Rice was at substantial risk of an assault from another inmate and that jail officials knew of this risk. Nor has the Estate identified any connection between this incident and the second one—they occurred in different units of the jail and involved different inmates—which might suggest that the later incident was foreseeable in light of the former.

The Estate submitted an affidavit from inmate George, who assaulted Rice with the broomstick, explaining that he attacked Rice because he had become fed up with

the smell emanating from Rice's cell. But the district court excluded from evidence George's affidavit, along with another affidavit and a declaration from two other inmates who were housed in the administrative segregation unit with Rice,[3] because the Estate had not disclosed these three inmates as prospective witnesses as required by Federal Rule of Civil Procedure 26(a) and (e), and the court surely did not abuse its discretion in so ruling. Although the Estate had obtained the names of these individuals from the defendants during discovery, the Estate did not disclose them as witnesses until responding to the defendants' motions for summary judgment, and by that time, discovery had closed and the defendants could not depose them. The omission was neither substantially justified nor harmless, such that it might be overlooked pursuant to Rule 37(c)(1). As the district court rightly observed, "The defendants aren't required to guess which of the many individuals identified during discovery the Estate intends to use to support its claims—that is the sort of indirection the disclosure rules are designed to avoid." 2009 WL 1748059, at *8.

---

[3] Collectively, the affidavits and declaration from these inmates reiterated Shaw's account of what happened the night that Rice died—i.e., that they heard Rice's distress and attempted without success to gain the attention of the guards—and also asserted that Rice's health was in an obvious state of decline during the final months of his life, that Rice did not always receive his meals, that his cell was frequently littered with uneaten food, and that his hygiene was noticeably poor.

Without George's affidavit, the second attack on Rice indeed appears to have been random, just as the district court characterized it. But even with the explanation provided by George's affidavit, there would be no basis on which to conclude that the jail was aware of a substantial risk of injury to Rice. Jail personnel certainly were aware that Rice had a hygiene problem, but so far as the record reveals, they had no notice that he was at risk of assault because of that problem, particularly within the more secure confines of the administrative segregation unit.

### E.   IS CENICEROS A STATE ACTOR?

The Estate's claim against Dr. Ceniceros is primarily focused on his refusal to admit Rice to Oaklawn in October 2004. Recall that Dr. Rohrer, concerned that Rice was in peril of dying, had obtained a court order authorizing Rice's involuntary commitment to one of four inpatient facilities, and Rohrer had attempted to have Rice admitted to Elkhart General Hospital. But after Elkhart General refused to admit Rice in the mistaken belief that it had no contract with the jail, Rice was instead taken to Goshen, where he was seen by Dr. Mathew. Although Rice was determined to be medically stable, Dr. Mathew consulted by telephone with Dr. Ceniceros as to whether Rice might need inpatient psychiatric care, which Goshen was not equipped to provide. But Ceniceros allegedly told Mathew that he did not believe Rice met the criteria for involuntary admission and, based on his prior observations of Rice,

that he was likely malingering. The Estate contends that Ceniceros' refusal to admit Rice sight unseen, despite familiarity with Rice's schizophrenia, his troubled history at the jail, as well as his colleague Rohrer's conclusion that Rice was in urgent need of inpatient care, amounted to deliberate indifference to Rice's condition. Ceniceros' employer, Oaklawn, had contractually undertaken to provide inpatient psychiatric services to jail inmates who needed it, and so, in the Estate's view, Ceniceros was a state actor vis-à-vis the psychiatric care that he provided to (or withheld from) inmates. In the Estate's view, then, if Ceniceros was deliberately indifferent to Rice's psychiatric condition as alleged, he could be liable as a state actor for his indifference just as CMS's nurses could be and, for that matter in the same way that Ceniceros' colleague, Dr. Rohrer—himself an Oaklawn physician—could be.

The district court disposed of the claim against Ceniceros on the ground that he was not a state actor, contrary to the Estate's contention. The court focused on Rice's prior commitments to Oaklawn in October 2003 and May 2004, rather than Ceniceros' refusal to admit Rice in October 2004. The record, as the court understood it, indicated that Ceniceros had accepted Rice for treatment at Oaklawn on the two prior occasions not by virtue of Oaklawn's contract with CMS, but rather pursuant to the court orders which committed Rice involuntarily to Oaklawn for observation and treatment. 2009 WL 1748059, at *16. Presumably, although the court did not address the events of October 2004, the court likewise would have emphasized

that Rice's commitment to Oaklawn was being sought on that occasion not pursuant to Oaklawn's contract with the jail but pursuant to the court's order authorizing Rice's involuntary commitment to one of four facilities, including Oaklawn. The court acknowledged that the Supreme Court's decision in *West v. Atkins*, 487 U.S. 42, 51, 108 S. Ct. 2250, 2256 (1988), recognizes that private physicians may be deemed state actors when they provide medical care to prisoners at the prison. But the court concluded that *West*'s rationale does not extend to a private psychiatrist who accepts an inmate into his care pursuant to an emergency commitment order. 2009 WL 1748059, at *16. Providing psychiatric care to an individual who has been involuntarily committed for such care is not a function traditionally reserved to the state, the court reasoned. *Id.* Because, in the court's view, Dr. Ceniceros did not serve a public function in caring for Rice, his role was not that of a state actor.

We have our doubts as to whether the district court was correct in categorizing Ceniceros as a private rather than a state actor. Rice was treated by Ceniceros in fulfillment of the jail's obligation to provide medical care, including necessary psychiatric care, to Rice as an inmate of the jail. The orders committing Rice to a private facility simply reflect a judicial determination, solicited by Rohrer as the jail's mental health care provider, that Rice required more intensive psychiatric treatment than could be provided to him at the jail, and treatment that had to be provided without his consent. And the record suggests that it was not happenstance

or judicial fiat that resulted in Oaklawn's selection as the facility to which Rice would be committed on the first two occasions in October 2003 and May 2004 (and as one of the four facilities to which he could have been committed in October 2004). Rather, the facts support the inference that Rice was committed to Oaklawn because of Oaklawn's voluntary, contractual undertaking to provide psychiatric services to the jail's inmates.[4]

The commitment orders did not alter Rice's status as a pretrial detainee. Because he was incarcerated, the jail had an obligation to address Rice's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). That obligation included a duty to provide psychiatric care to Rice as needed. *Sanville v. McCaughtry*, *supra*, 266 F.3d at 734; *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983).

If Rice had been committed to the state's own facility for treatment by state-employed physicians, there would be no question that those physicians would qualify as state actors who could be liable for any deliberate indifference to his psychiatric needs: "'Institutional physicians assume an obligation to the mission that the

---

[4] We note that when Rohrer sought Rice's admission to Elkhart General in October 2004, that hospital refused to accept Rice in the erroneous belief that it had no contractual arrangement with the jail. This suggests that neither Elkhart nor any of the other three facilities designated in the court's commitment order were obligated to accept Rice in the absence of a contractual relationship with the jail.

State, through the institution, attempts to achieve.' " *West*, 487 U.S. at 51, 108 S. Ct. at 2256 (quoting *Polk County v. Dodson*, 454 U.S. 312, 320, 102 S. Ct. 445, 451 (1981)). This would be true whether Rice were committed to a psychiatric unit within the jail, *cf. Washington v. Harper*, 494 U.S. 210, 110 S. Ct. 1028 (1990) (prisoner medicated against his will at prison medical facility), or instead transferred to a state-owned facility outside of the jail, *cf. Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452 (1982) (recognizing that state facility for mentally disabled has duty to provide, among other things, safe conditions of confinement to mentally disabled adult who was involuntarily committed to that facility); *see also Collignon v. Milwaukee County*, *supra*, 163 F.3d at 987 ("When a state actor such as Milwaukee County deprives a person of his ability to care for himself by incarcerating him, detaining him, or involuntarily committing him, it assumes an obligation to provide some minimal level of well-being and safety.") (coll. cases).

That Rice was instead committed to the care of a private psychiatrist—or, in the third instance, was refused care by that psychiatrist—whose employer had contracted to provide psychiatric care to the jail's inmates, arguably does not alter the analysis materially. The Supreme Court has not yet addressed whether medical care provided to a prisoner in a private facility outside of the prison walls constitutes state action. However, in *West*, the Court held that medical care provided on the grounds of the prison by a private physician under contract with the state does constitute state action: "Respondent, as a physician employed by North Carolina to

provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State." 487 U.S. at 54, 108 S. Ct. at 2258. Although the court cited the location of the treatment as one factor supporting its conclusion, *id.* at 56 n.15, 108 S. Ct. at 2259 n.15, nothing in its analysis suggests that the result necessarily would have been different had the care been provided at a private facility. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009) ("The state clearly does not relieve itself of its responsibility to provide medical care solely on account of the venue where those services are rendered.") (citing *Conner v. Donnelly*, 42 F.3d 220, 225-26 (4th Cir. 1994) (deeming private physician who treated prisoner's injury in physician's office outside prison to be state actor). Instead, central to the court's analysis was that the care was provided under contract with the prison in fulfillment of the prison's obligation to provide for the inmate's medical needs.

That is arguably just as true here as it was in *West.* One might infer that on each of the three occasions when the court ordered Rice's involuntary commitment, Ceniceros and Oaklawn became involved not because the court chose Oaklawn for its own reasons, or because Oaklawn was otherwise obliged to provide psychiatric care to all who sought it, as an emergency room might be, *cf. Rodriguez*, 577 F.3d at 827-28, but rather because Oaklawn had voluntarily agreed to provide inpatient psychiatric care to the jail's inmates when needed. As we observed in *Rodriguez*:

> When a party enters into a contractual relationship with the state's penal institution to provide specific medical services to inmates, it is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons. In such a circumstance, the provider has assumed freely the same liability as the state. Similarly, when a person accepts employment with a private entity that contracts with the state, he understands that he is a accepting the responsibility to perform his duties in conformity with the constitution.

*Id.* at 827. Had it been possible for Rice to receive inpatient care from Ceniceros on the premises of the jail, there would be no question that Ceniceros would qualify as a state actor under both *West* and *Rodriguez.* And the district court's focus on the court-ordered nature of Rice's commitments implicitly presumes that had Rice been accepted for admission at Oaklawn in the absence of such an order, the same might be true. *Cf. Rodriguez*, 577 F.3d at 830 (assuming that claim against private ambulance service for alleged deliberate indifference during inmate's transport from prison to hospital would be viable if, inter alia, transportation was provided pursuant to contract with prison system); *id.* at 831-32 (private hospital that accepted inmate for care pursuant to contract could be liable as state actor).

The court viewed the judicial commitment orders as superseding Oaklawn's voluntary assumption of the jail's duty to provide psychiatric care to its inmates. But

the record suggests that the orders had much more to do with overruling Rice's will than with Oaklawn's willingness to treat Rice on its premises. Rohrer sought the court orders because Rice, among other things, was refusing to take his anti-psychotic medications. As we discuss below, provided he did not pose a danger to himself or others, Rice had that right. He was committed involuntarily for inpatient treatment so that, in part, he could be forcibly medicated. One could infer that Oaklawn's status did not change as a result of the court orders—it was still providing exactly the sort of inpatient psychiatric care that it had contractually agreed to provide. Indeed, Oaklawn and Ceniceros remained free to reject Rice's admission, as evidenced by Ceniceros' outright refusal to admit Rice in October 2004. Elkhart General itself refused Rice's admission in October 2004 in the mistaken belief that it had no contract to provide inpatient care to the jail's inmates. On these facts, a factfinder might conclude that Oaklawn and Ceniceros were not dragooned into treating Rice as a result of the court's commitment orders, but rather had voluntarily assumed that role by virtue of Oaklawn's contract with the jail. *Cf. Rodriguez*, 577 F.3d at 831 (hospital which declined to provide non-emergency care to prisoner because it lacked contract with prison system, and instead provided only such emergency care as it would have provided to any member of general public, did not constitute state actor).

We need not ultimately resolve Ceniceros' status, however, because as we discuss later in this opinion, we conclude that the facts do not support a finding of delib-

erate indifference on Ceniceros' part. We have voiced our doubts about the district court's conclusion that Ceniceros was not a state actor because that is the sole basis on which the district court resolved the Estate's claim against Ceniceros and because, given the widespread practice of outsourcing jail and prison medical services to private contractors, it is certain that this issue will recur. We do not consider what we have said here to be binding, but we do wish any future court's exploration of this issue to take into consideration the circumstances we have highlighted as relevant to the state-actor determination.

## F.   OFFICIAL POLICY OR CUSTOM CLAIMS

The Estate has sued Sheriff Books, the keeper of the jail, and two other officials of the jail (Captain Rogers, jail commander, and Lieutenant Call, warden) in their official capacities, along with CMS and Oaklawn, seeking to hold them liable for customs or policies—including the failure to train their respective staffs to deal appropriately with mental illness—which the Estate believes contributed to Rice's death. The Estate cites Books and the jail for a laundry list of omissions and failures which it contends evinces the jail's indifference to mentally ill inmates with self-destructive tendencies. In particular, it criticizes Books for (1) inadequate training and supervision of the jail staff generally; (2) not adequately training Rogers and Call and the rest of the jail staff in the appropriate treatment of mentally ill inmates; (3) not having adequate policies in place to deal with severe

mental illness; (4) not educating Rogers as to the jail's suicide prevention policy and not ensuring that this policy was followed after Rice cut his neck; (5) having a policy conditioning the transfer of an inmate to a psychiatric facility on Oaklawn's approval (which Ceniceros repeatedly refused to give), and, knowing of Rice's condition, not exercising his own purported authority to transfer Rice to such a facility; (6) not ensuring compliance with the jail policy requiring hourly checks on inmates in administrative segregation, which the Estate alleges were not made on the night of Rice's death; and (7) inadequate training of jail staff as to the use of force on mentally ill inmates, and/or faulty policies as to the use of force on such inmates. As to CMS, which was responsible for the general medical care of the jail's inmates, the Estate's theory is that inaction on the part of CMS's nursing staff at a minimum reflects a failure to adequately train its staff to properly care for mentally ill inmates like Rice, if not a policy and practice of ignoring the medical needs of such inmates. The Estate reasons that Rice's mental illness was known from the outset of his incarceration, and by the close of 2003 his overall decline was apparent in his refusal to take his medication, weight loss, repeated state of undress, and recorded observations that he was psychotic. Yet, according to the Estate, the nurses took no meaningful steps to correct Rice's downward spiral. They remained passive in the ensuing months even as Rice's physical and mental states continued to decline. By way of example, the Estate notes the lack of any affirmative evidence in the jail's shower log that Rice was showered between November 2003 and

August 2004, along with the nurses' purported failure to take appropriate steps after Rice cut his neck with the razor. Finally, the Estate contends that Oaklawn too is responsible for Rice's demise through the actions of Ceniceros, whom it characterizes as Oaklawn's decisionmaker by virtue of his unfettered discretion vis-à-vis the admission of inmates to Oaklawn's facility. The Estate alleges that Ceniceros recklessly wrote Rice off as a malingerer and refused his admission to Oaklawn in October 2004 despite his colleague Rohrer's conclusion that Rice was in danger of dying from malnourishment and Dr. Mathew's consultation with him as to the possibility of psychiatric intervention.

The district court found that the evidence did not support the imposition of municipal or corporate liability against any of these defendants. The court found that because the Sheriff was entitled generally to defer to medical professionals as to the appropriate treatment of mentally ill prisoners, there was nothing deliberately indifferent about the jail's practice of leaving to Oaklawn the decision whether or not to transfer a particular inmate to a facility outside of the jail for treatment. 2009 WL 1748059, at *18. And the Estate had cited no authority for its contention that Sheriff Books could have ordered such a transfer on his own. *Id.* As to the adequacy of the training and supervision that the Sheriff had provided to Rogers and Call and the rest of the jail's staff, the Estate had not shown any causal link between the purported deficiencies and any shortcomings in the medical and psychological care provided

to Rice. *Id.*, at *19. Books had in no way impeded or interfered with Rice's treatment by the medical professionals and was entitled to rely on them to provide adequate care to Rice. *Id.* Finally, assuming that personnel had failed to follow the jail's suicide prevention policy after Rice cut his neck, and assuming that this failure was reflective of a policy or practice rather than being a one-time omission, there was no proof that this had anything to do with Rice's eventual death: Rice did not, after all, commit suicide. *Id.* With respect to CMS, the court saw no evidence of a custom or policy reflecting indifference to the needs of mentally ill inmates like Rice. *Id.*, at *20-*21. CMS nurses had generally seen Rice three times every day and had made efforts to care for him. *Id.*, at *20. Decisions as to Rice's psychiatric care were reserved to Rohrer and Oaklawn pursuant to the contract between CMS and Oaklawn, and the record indicated that CMS personnel relied upon and carried out Rohrer's instructions and communicated with him regularly to keep him apprised of Rice's condition. *Id.* Finally, to the extent that the nurses were responsible for the decision not to put Rice on suicide watch following the razor incident, there was no evidence that they exhibited deliberate indifference in making that decision. *Id.* Last, as to Oaklawn, the court found the Estate's claim deficient in that it was based solely on the individual actions of Rohrer and Ceniceros rather than any custom or policy of Oaklawn itself. *Id.*, at *21.

Private corporations acting under color of state law may, like municipalities, be held liable for injuries

resulting from their policies and practices. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36 (1978); *Rodriguez v. Plymouth Ambulance Serv., supra*, 577 F.3d at 822 (*Monell* framework applies to private corporation acting under color of state law) (citing *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008)). In order to recover against a municipal or corporate defendant under section 1983, it is not enough for the plaintiff to show that an employee of the municipality or corporation violated his constitutional rights; he must show that his injury was the result of the municipality's or corporation's official policy or custom. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S. Ct. 1292, 1298 (1986) (plurality); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817, 105 S. Ct. 2427, 2432-33 (1985); *Monell*, 436 U.S. at 690-91, 98 S. Ct. at 2035-36. "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by municipal policymakers. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989) (quoting *Pembaur*, 475 U.S. at 483-84, 106 S. Ct. at 1300-01) (plurality)). An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation. *E.g.*, *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). The plaintiff must also

show a direct causal connection between the policy or practice and his injury, in other words that the policy or custom was the "'moving force [behind] the constitutional violation.'" *Harris*, 489 U.S. at 389, 109 S. Ct. at 1205 (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. at 2038, and *Polk County v. Dodson*, *supra*, 454 U.S. at 326, 102 S. Ct. at 454). The failure to provide adequate training to its employees may be a basis for imposing liability on a municipality or private corporation, but as with any other policy or practice for which the plaintiff seeks to hold the municipal or corporate defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact. *Ibid*.

We affirm the district court's judgment as to these claims. The Estate has not identified evidence sufficient for the factfinder to conclude that any of the three sets of defendants maintained a policy or custom evincing deliberate indifference to the needs of mentally ill prisoners that resulted in harm to Rice.

Beginning with Sheriff Books and the jail supervisors, we note that most of the errors and omissions cited by the Estate have to do with how Rice's mental illness and the manifestations of that illness were handled by the jail staff. The jail certainly has an obligation to provide for the psychiatric care of its inmates pursuant to its constitutional obligation to address their serious medical needs. *See Sanville v. McCaughtry*, *supra*, 266 F.3d at 734; *Wellman v. Faulkner*, *supra*, 715 F.2d at 272. But the

Estate makes no allegation that the jail had any sort of policy or practice that deprived inmates of reasonable access to medical and psychiatric professionals or interfered in some way with the treatment prescribed by those professionals. The closest to such an allegation is the Estate's charge that the jail would not transfer an inmate to a psychiatric facility without Oaklawn's approval and that Sheriff Books failed to exercise his own purported authority to transfer Rice without such approval. The Estate's expert, Ken Katsaris, former sheriff of Leon County, Florida (Tallahassee), opined that Books had this authority and should have exercised it in Rice's case. But as the district court noted, jail officials ordinarily are entitled to defer to the judgment of medical professionals. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006); *Brownell v. Figel*, 950 F.2d 1285, 1291-92 (7th Cir. 1991). Certainly jail officials may not turn a blind eye to an inmate in distress or to obvious incompetence on the part of the physicians and nurses treating its inmates. *See Arnett*, 658 F.3d at 755-56. However, although it cannot be denied that Rice fared poorly within the confines of the jail, no evidence cited to us would permit a factfinder to conclude that Books, Rogers, or Call should have second-guessed the judgment of Drs. Rohrer or Ceniceros or any other medical professional as to how Rice should be treated and sought care for him elsewhere. The Estate, in broad strokes, criticizes the training of jail staff generally and their training in the handling of mentally ill prisoners in particular, but has not explained how any particular

omission in their training harmed Rice. Its only specific contention is that personnel did not follow the jail's suicide prevention policy after Rice cut his neck with a razor. But there are multiple and obvious flaws with this theory: (1) the Estate does not come to grips with the fact that a CMS nurse, Hess, concluded after looking into the incident that it was not, in fact, a suicide attempt—a view shared by the physician who saw Rice at Goshen General Hospital; (2) even assuming it was a suicide attempt, no showing has been made that the failure to follow the suicide prevention policy was something other than an aberration; (3) Rice's subsequent death, as the district court rightly emphasized, was not the result of suicide but rather as the result of his psychogenic polydipsia; and (4) assuming, as the Estate evidently does, that placing Rice on suicide watch would have made it more likely that his compulsive water drinking and its lethal effects would have been discovered by jail personnel in time to save his life, the Estate does not explain why the jail should be held liable for the failure to follow a policy that is aimed at a danger altogether distinct from the one that actually killed Rice. The staff's alleged failure to conduct the requisite hourly checks of the administrative segregation unit on the night Rice died arguably has a more direct and foreseeable connection to his death, assuming that such checks are designed to detect the very sort of sudden and unexpected occurrence that killed Rice. But as with the failure to observe the dictates of the suicide prevention policy, the Estate has made no attempt to argue that the failure to conduct the

hourly checks on the night of Rice's death was a common and known practice at the jail rather than an isolated occurrence. *Cf. Woodward v. Correctional Med. Servs of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (evidence that CMS knew of and condoned violations of its written policies supported imposition of corporate liability). Finally, although the Estate complains that staff members were not given adequate instruction as to the proper use of force against mentally ill prisoners, it offers no detail as to what specifically was lacking in their training and how better training would have altered their conduct when Rice fought with his cellmate or when he refused to remove himself from a restraint chair, for example. We said earlier that the Estate's custom or practice allegations against Books and the jail amounted to a laundry list, and we reiterate that point here: The Estate has made a series of conclusory allegations without in most instances making even a rudimentary attempt to identify a policy or practice which was the moving force between a constitutional harm that Rice suffered.

The case against CMS fares little better. CMS's nurses were arguably best situated to observe Rice's decline not only because they saw him on a daily basis, knew of his diagnosis, and witnessed firsthand his frequent refusals to be medicated, to communicate, and to eat, but also because as medical professionals they likely would have appreciated the connection between those behaviors and Rice's schizophrenia as well as the potential ramifications of his seclusion, lack of self-care, and weight loss. The record does not suggest, as the Estate at points does,

that the nurses simply threw up their hands while
Rice's health declined. They did make regular efforts to
convince him to eat and to take his prescribed medica-
tions; and so far as the record reveals, they faithfully
reported his condition to the physicians who were
charged with overseeing his care. The Estate may have
a point when they assert that the nurses could have
done more to ensure that Rice was cleaned up more
regularly than the record indicates that he was. But even
if we assume that the nursing staff failed Rice in this
or other respects, the Estate, beyond criticizing the suf-
ficiency of their training, has once again made no effort
to identify a policy or practice that would support a
finding that CMS itself was deliberately indifferent to
the plight of mentally ill prisoners like Rice. Insofar as the
nurses, too, are criticized for the response to the razor
incident, we repeat the point that there is no evidence
linking this one incident to some broader policy or
practice of CMS.

As for Oaklawn, the district court rightly pointed out
that the Estate's claim rests entirely on the acts of
Rohrer and Ceniceros as opposed to some policy or
custom attributable to the hospital. The acts of an indi-
vidual with policymaking authority can be attributed
to the corporation that employs him, *Pembaur*, 475 U.S.
at 480, 106 S. Ct. at 1298-99, and this is the theory that
the Estate presses on appeal. Ceniceros, it argues, had
final say on whether an inmate like Rice could be
admitted to Oaklawn, and thus he was a policymaker in
that respect. This is the extent of its abbreviated argu-
ment. The district court did not address this theory in its

thorough decision, and for good reason: It was not argued below. We have reviewed the written memorandum that the Estate submitted in opposition to the defendants' motions for summary judgment, R. 276, and also the transcript of the oral argument that the district court held on those motions, R. 349, and nowhere did we find any argument, let alone a developed one, making a case that Ceniceros should be treated as a policymaker for Oaklawn. Even in this court, the argument is so summarily made that Oaklawn has neither noticed nor responded to it. We therefore deem the argument forfeited, and because this is not the extraordinary case that might warrant overlooking the forfeiture, *see Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 803 (7th Cir. 2010), we will not address it.

## G. DELIBERATE INDIFFERENCE OF JAIL OFFICIALS

The Estate asserts that two groups of jail personnel are liable for Rice's death. These include four of the guards who were on duty the night that Rice died (officers Shelton, Scott Eisenhour, Kimberly Baxter, and Samantha Werth) as well as Books, Rogers, and Call, this time in their individual capacities. The Estate's theory is that the entire staff of the jail, from supervisors to guards, was aware that Rice was severely mentally ill. Even if jail personnel were unaware of the possibility that he might die from water toxicity brought on by compulsive water drinking, the Estate reasons, there were fifteen months of warning signs prior to his death that Rice could not care for himself and suffered from self-

destructive tendencies, and a jury could find that staff members were subjectively aware of the substantial risk that Rice might harm himself fatally in some way. That knowledge, the Estate argues, compelled the jail defendants to keep Rice under close watch in order to prevent him from hurting himself. Certainly once Rice had cut his throat with the razor in August 2004, he should have been treated as a suicide risk, the Estate reasons: "Had Defendants followed their own suicide prevention policies, the likelihood of Nicholas's death would have been greatly diminished or prevented." Estate Br. 45. Instead, they ignored the risk, and thus increased the odds that Rice might injure himself to the point of death before anyone could intervene. And the guards on duty the night Rice died allegedly did not comply with the jail's standing rule that inmates housed in the administrative segregation unit be checked upon hourly and did not respond to the door-kicking of inmates who heard Rice's distress.

The district court rejected the deliberate indifference claims against these defendants on the ground that jail staff, even if they did appreciate the gravity of Rice's mental illness, had no warning that Rice might experience the psychogenic polydipsia that caused his death. With respect to the guards, the court assumed, consistent with inmate Shaw's affidavit, that they had not made hourly checks of the administrative segregation unit on the night Rice died. 2009 WL 1748059, at *5, *22. Still, the court believed that the guards could not be characterized as deliberately indifferent to Rice's plight because there was no evidence that those guards in par-

ticular knew of his serious medical condition and, even if they did, they could not have foreseen his death from water intoxication. *Id.,* at *22. And assuming that other inmates in the unit with Rice had indeed kicked their doors when they heard Rice in distress, the evidence did not suggest that their entreaties included any warning that Rice was in extremis and needed medical attention. *Id.* In short, the guards were not alerted to the need to regularly monitor Rice to prevent an occurrence of the kind that resulted in his death. *Id.* As for Books, Rogers, and Call, the court agreed that they were aware of Rice's medical condition. *Id.,* at *23. But they were entitled to rely on the expertise of medical personnel as to the appropriate care of Rice, and they granted Rice access to medical treatment, did not interfere with said treatment, and did not withhold relevant information from the medical professionals. *Id.* There was no evidence that jail managers should have questioned the judgment of those professionals, especially where medical personnel had access to medical records that jail officials themselves were forbidden under federal law from seeing. *Id.*

Although we do not concur with the district court's reasoning in all respects, we nonetheless conclude that the district court correctly granted summary judgment to these defendants. A factfinder might conclude that the guards exhibited a generalized recklessness with respect to the safety of the inmates housed on Ward One by failing to conduct hourly checks of the administrative segregation unit. But there is no evidence that the guards were subjectively aware of the possibility that

Rice might engage in a behavior such as compulsive water drinking that would cause him to die within a matter of hours and that they consciously disregarded that risk. Nor is there evidence that the jail's supervisors were aware of such a possibility. On this record, a factfinder could not reasonably conclude that any of the jail personnel were deliberately indifferent to this sort of risk.

A reading of the record favorable to the Estate certainly would support a finding that the guards failed to conduct hourly checks of the administrative segregation unit on the night of Rice's death. Inmate Shaw, who was housed in the cell next to Rice's, averred in his affidavit that over the course of multiple hours during which Rice could be heard vomiting, no guard came to check on inmates in the unit, even after Shaw and other inmates began mule-kicking their doors in an unsuccessful effort to gain the guards' attention. Although the named guards and the jail insist that hourly checks on the unit were made, and that nothing out of the ordinary was apparent, Shaw's affidavit is enough to create a factual dispute on this point, as the guards' counsel rightly concedes. *Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003). If no checks were made, a factfinder certainly could conclude that the guards who were required to make those checks were indifferent to the concerns underlying the rule mandating those checks.

Surprisingly, not only do the briefs fail to discuss the purpose and nature of the jail's administrative segregation unit and the types of inmates who are placed

in that unit, they also omit any discussion of the reasons for the hourly check rule. Administrative segregation is often used to isolate from the general population of the prison inmates who either pose a danger to other inmates or who may be especially vulnerable to assaults by other inmates. But we do not know whether the administrative segregation unit in Elkhart's county jail was regularly used (and was known by the guards to be used) as a place to house prisoners who required frequent observation *because* they were medically fragile or likely to harm themselves. Proof along those lines might support a finding that the guards appreciated the risk they were taking by not conscientiously making their rounds. *Cf. Arnett v. Webster*, *supra*, 658 F.3d at 755 ("Non-medical defendants simply cannot ignore an inmate's plight."); *Sanville v. McCaughtry*, *supra*, 266 F.3d at 739 ("If the [guards] were aware of the alleged risk [of suicide], failing to determine what was going on in [the inmate's] cell could easily be conduct egregious to rise to the level of deliberate indifference."). But no such evidence is cited to us. Rice's mental illness appears to have been common knowledge at the jail, and so we may assume for the sake of argument that each of the guards on duty knew of his illness. Yet there is no evidence that any of them, even if they were aware of his full history at the jail (including his weight loss, inability to care for himself, and frequent catatonia) knew that he might engage in behavior like compulsive water drinking that could quickly result in his death absent intervention by the jail staff.

The Estate's reliance on the razor incident as sufficient to place jail staff on notice of the risk to Rice is understandable, as that is the only prior incident that might fall into the category of self-destructive behavior necessitating immediate intervention. But the incident was investigated by nurse Hess and deemed not to be a suicide attempt. As we have noted, her view was shared by the physician at Goshen Hospital who treated Rice for his wound. And, again, Rice ultimately did not commit suicide. Rather than deliberately harming himself, he suffered a compulsion to drink excessive water which resulted in a drop in his blood sodium levels and a heart attack. Categorizing both incidents as manifestations of Rice's self-destructive tendencies, and insisting that the incident with the razor blade was enough to make the jail staff aware that Rice might harm himself involuntarily and inadvertently, ignores the substantial differences between the two incidents and the lack of any warning whatsoever that Rice might die as a result of a phenomenon like psychogenic polydipsia. So even if the guards recklessly failed to conduct hourly checks as they were required to do, no reasonable factfinder could find that they knew of, and were deliberately indifferent to, a risk that Rice might come to medical harm like cardiac arrhythmia brought on by water toxicity were he not checked on regularly. *See State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (even if defendant police officers disregarded established procedures, such as conducting hourly checks of detainees, deliberate indifference not shown in absence of evidence that defendants were actually aware that

detainee who killed himself was a suicide risk, and reasonable precautions against suicide had otherwise been taken); *see also Cagle v. Sutherland*, 334 F.3d 980, 987-88 (11th Cir. 2003) (per curiam) (failure to conduct hourly checks of detainees as required by prior consent decree insufficient by itself to establish deliberate indifference to detainee who committed suicide, absent evidence that defendants had actual knowledge of risk that a detainee was likely to commit suicide); *Hott v. Hennepin County, Minn.*, 260 F.3d 901, 907-08 (8th Cir. 2001) (deputy's alleged failure to conduct requisite hourly checks of special needs section of detention center insufficient to show deliberate indifference to needs of inmate who killed himself, where evidence did not show deputy's awareness of substantial risk that an inmate might commit suicide); *Timson v. Juvenile & Jail Facility Mgmt. Servs., Inc.*, 355 F. App'x 283, 286 (11th Cir. 2009) (per curiam) (non-precedential decision) (deliberate indifference not shown despite failure of guards to check jail inmates every thirty minutes as required by their corporate employer's policy, where evidence did not show guards had reason to be suspicious that inmate had suicidal tendencies).

Accepting the Estate's version of the facts as true, the possibility that the guards did not respond to the kicking and shouting of other inmates is particularly disturbing. We do not agree that simply because the inmates did not somehow expressly signal that there was a medical emergency, the guards were not placed on notice that an inmate was in medical distress. Presumably that information would have been conveyed had

any guard heard the commotion and responded; and medical distress would be one possibility that the inmates' urgent kicking would convey. The whole point of the door-kicking, one may infer, was to alert the guards that something was amiss and convince them to come into the unit so that they could be told just what that was. Either none of the named guards heard the kicking and shouting, or one or more of them did hear it and simply did not bother to investigate.

Nonetheless there are at least two problems with this claim that foreclose relief to the Estate. First, there is no discussion in the Estate's brief as to which of the four named guards, if any, would have been in a position to hear the door-kicking of the inmates on Ward One. We know very little about how the jail, and the administrative segregation unit in particular, was monitored in the overnight hours; nor do we know where any of the four named guards was stationed in the jail on the night of Rice's death. Was the jail so small that vigorous door-kicking in Ward One would have been heard anywhere on the premises? Even if not, would the assigned rounds of all four of the named guards—apart from conducting hourly checks of Ward One itself—have at least brought them within hearing range of the administrative segregation unit at some point during the hours immediately prior to Rice's death, such that they would have heard the kicking? Such questions are left unaddressed by the briefs. Second, the Sheriff's counsel, at oral argument both before the district court and this court, and without contradiction by the Estate, noted that the guard (Bruno Martinsky) who was

stationed in the control room just across the hall from the administrative segregation unit on the night of Rice's death—and was thus in a position to have heard any commotion on Ward One—had been dismissed from the litigation by the Estate. *See* R. 349 at 50.

Our discussion as to the jail supervisors (Books, Call, Rogers) may be much more brief. The Estate does not contend that any of these three defendants was responsible (in his individual capacity) for the failure to check on Rice the night he died. Its theory instead is that these defendants were all aware of Rice's severe mental illness and his increasingly pitiful condition and should have, at the least, taken steps to monitor his condition more closely, as by putting him on suicide watch, so that his compulsive water drinking on the night of his death would not have gone unnoticed. We have already disposed of the notion that the jail should have put Rice on suicide watch. It appears that Rice was put in the administrative segregation unit at least in part to monitor him more closely, and we are told that his assigned cell (5A) was the cell most easily seen from the control room across the hall. It also appears that as Rice's condition deteriorated, jail administrators made more of an effort to keep track of his weight, showering, and so forth. We may assume that jail officials, short of treating Rice as a suicide risk, could have done more to watch Rice. (We have already observed that a jury could find jail personnel liable for deliberate indifference to his conditions of confinement.) But what precludes the Estate from recovering against these officials for Rice's death is the

lack of any evidence that they were on notice of the type of risk that materialized when Rice unexpectedly began to consume excessive amounts of water. Jail officials had no forewarning of that type of event, or of the risk that he might die suddenly when it occurred.

## H.  DELIBERATE INDIFFERENCE OF CMS NURSES

The Estate's claims against the individual nurses who cared for Rice at the jail fall into three categories: (1) a claim based on the failure to note Rice's distress on the night Rice died; (2) a claim based on the incident in which Rice was pepper-sprayed by a guard and then left for a prolonged period in the restraint chair; and (3) a claim based on the adequacy of the care Rice received from the nurses over the period of his incarceration at the jail. The claim as to the night of Rice's death is focused on Lambright. Because Lambright was on duty at the jail on the night that Rice died, and because she was aware of his condition and history at the jail, the Estate appears to suggest that Lambright should have been checking on Rice herself over the course of the evening. Relatedly, the Estate contends that Lambright, being aware of the razor incident, should have seen to it that Rice was placed on suicide watch, so that he would have been monitored more closely and so that the distress associated with his psychogenic polydipsia would have been noticed. Lambright is also cited for the response to the pepper-spray incident, along with Bell. The Estate's contention is that the two nurses displayed deliberate indifference by not

doing more to prevent and/or remediate the guards' use of pepper spray and by leaving Rice shackled in a restraint chair for eighteen hours. As to the totality of Rice's care at the jail, Hess, Lambright, Bell, and Jones are named along with Nurse Florence Makousky and social worker Margaret Miller. The Estate reasons that their deliberate indifference may be inferred from their alleged failure to heed multiple warning signs that Rice's mental illness was severe and to pursue more proactive intervention rather than blindly deferring to the physicians whose own conduct was, in the Estate's view, far too passive. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (a nurse's deference to physician "may not be blind or unthinking, particularly if it is apparent that the physician's order will harm the patient").

The district court gave primary emphasis to two points in rejecting the Estate's claim against CMS's nurses. First, it stressed that the nurses were entitled to defer to the medical judgment of Oaklawn, Ceniceros, and Rohrer as to the appropriate treatment of Rice. 2009 WL 1748059, at *24. Second, the court noted that the nursing staff visited Rice multiple times daily, monitored his weight, regularly made efforts to get him to eat more, and also encouraged him to take the medications prescribed by Dr. Rohrer. *Id.*, at *24, *26. Although the court agreed that more could have been done to monitor Rice's condition and to treat his illness, it found the evidence insufficient to support an inference that the nurses were deliberately indifferent to Rice's serious medical needs. *Id.*, at *26.

We agree with the district court that the record does
not support a finding that any of the CMS nurses
ignored a known medical risk in caring for Rice. To
begin with a point we have made already, Rice died not
as a result of any volitional self-destructive tendencies
that were known to the nursing staff but rather due to
a compulsion to drink large amounts of water that,
so far as anyone knew, Rice had never experienced
before. Moreover, as the district judge pointed out, deci-
sions as to Rice's treatment—including a decision to
medicate him against his will, which might have
reduced the likelihood of psychogenic polydipsia—
belonged to Rice's physicians rather than his nurses.
Nurse Lambright was on duty the night Rice died, and
the Estate appears to fault her for not ensuring that he
was checked on regularly and/or for failing to check on
Rice herself. But the Estate points us to no evidence
that Lambright was under an obligation to check on
Rice and the other inmates in the administrative seg-
regation unit hourly, for example, nor does it cite any
evidence that Lambright was within hearing range of
the unit such that she would have heard the kicking of
the other inmates in that unit. Insofar as it might have
been within Lambright's province to admonish the
guards to make their own hourly checks of Ward One,
the notion that she should have exercised that authority
is premised on Lambright's knowledge of the incident
in which Rice had cut his neck with the razor. Again,
however, we reject the Estate's contention that an
incident that could have been understood as a suicide
attempt (although CMS did not construe it as such) was

sufficient to make Lambright or any other nurse aware that Rice was at risk for an entirely distinct harm such as compulsive water drinking.

It is true that a nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health, *Berry*, 604 F.3d at 443; but with one possible exception we mention below (and which the Estate does not pursue), there is no evidence that any nurse consciously disregarded Rice's schizophrenia or its manifestations. Jones' testimony indicates that she and her colleagues saw Rice three or more times daily (when they distributed pills and made their rounds of the segregation unit),[5] monitored his condition and reported it to his physicians, attempted to convince him to take his medications, and tried to get him to eat more. They redoubled their efforts in the latter regard after Rice returned to the jail following his brief hospitalization at Goshen General Hospital, with the result that Rice's weight loss ceased.

We have considered whether a factfinder could conclude that the nurses were indifferent to the state of Rice's nutrition, given his weight loss and the mild to moderate malnutrition detected postmortem. Contrary to the defendants, we believe that Rice's malnutrition would be actionable regardless of whether it contributed to his death. *See Farmer v. Brennan*, *supra*, 511 U.S. at 832,

---

[5] As the district court noted, the Estate did not effectively dispute this fact in response to the defendants' statement of material facts below. 2009 WL 1748059, at *5 n.4.

114 S. Ct. at 1976 (citing provision of "adequate food" as among prison officials' duties); *Wilson v. Seiter*, *supra*, 501 U.S. at 303, 111 S. Ct. at 2326-27 (citing food as a condition of confinement); *Reed v. McBride*, 178 F.3d 849, 852, 853-54 (7th Cir. 1999) (alleged deprivation of food states Eighth Amendment claim depending on amount and duration of deprivation); *Freeman v. Berge*, *supra*, 441 F.3d at 546 (prison has duty to force-feed mentally ill prisoner if necessary to prevent starvation to degree which might seriously impair his health). Perhaps a factfinder could find some negligence on the part of the nurses in this regard, given the extent of Rice's weight loss before his hospitalization and their evident ability to help stop his weight loss after he was hospitalized without resorting to extraordinary measures like forced feeding. But we see no evidence that the nurses ever ignored the risks to Rice's health posed by his failure to eat. They were trying to get Rice to eat well before he was hospitalized; and if their efforts were more effective after the hospitalization, it was not, so far as the record reveals, because they were deliberately indifferent to the problem earlier.

The individual incidents that the Estate cites as examples of indifference by the nurses do not alter our conclusion that the nurses were not deliberately indifferent to Rice's condition. For example, it faults Nurses Lambright and Bell for standing by while Officer Shelton ordered that Rice be pepper-sprayed following the altercation with his cellmate and then leaving Rice in the restraint chair for eighteen hours. This is an echo of the Estate's excessive force claim, and it does not call

into question the nurses' response to Rice's medical needs (recall that the nurses helped cleanse Rice's face of the pepper spray, and that Rice refused to leave the restraint chair when invited to do so). The razor incident is mentioned once again, but we have already addressed that. Finally, Nurse Bell, as evidenced by her own notes, once told Rice (in response to his refusal to eat, take his medications, and communicate) that "acting like this won't get [you] out of jail like before." R. 198-37 at 5. Bell evidently thought that Rice was malingering, but she was not alone in that perception, and even if she was mistaken, the remark does not support the conclusion that she was deliberately indifferent to Rice's mental health or that she deliberately or recklessly withheld medical care that Rice needed.

There arguably might be one respect in which a factfinder might conclude that the nurses were deliberately indifferent, and that has to do with the state of Rice's hygiene and self-care. We noted earlier with respect to the conditions of confinement claim against the jail officials and guards that there is evidence that Rice went unshowered for long enough periods of time and that his body was visibly filthy and so malodorous that other inmates complained about the smell. There was also the one incident in which dead skin sloughed off of Rice's person as guards lifted him off his bunk. Bedsores, or the beginnings of such sores, were also noted on his body at times. As we have noted, jail personnel, including doctors and nurses, have an obligation to protect an inmate from his own self-destructive tendencies, in this case Rice's failure to clean himself. A

factfinder possibly could conclude that Rice's failure of self-care was a result of his schizophrenia and that the nurses, who saw Rice on a daily basis when he was in the administrative segregation unit, appreciated as much. Certainly there is evidence that the nurses made some efforts to address the problem: For example, Jones, the charge nurse, volunteered to come into the jail on her own time to shower Rice. Nonetheless, given the evidence that Rice went unbathed for significant periods of time, was developing bedsores, and had skin sloughing off his body when lifted up off of his bed, it is conceivable that a jury would find that the nursing staff had consciously disregarded the consequences of Rice's failure to care for himself and thus deprived him (or helped to deprive him) of humane conditions of confinement. Depriving Rice of sanitary conditions of confinement would be actionable regardless of whether the deprivation played a role in his death. *Cf. Vinning-El v. Long*, *supra*, 482 F.3d at 924 (sustaining viability of claim that inmate was subjected to unsanitary and otherwise inhumane confinement for period of three to six days) (coll. cases).

The Estate does not make such an argument as to the nurses, however. We therefore pursue the issue no further.

## I.   DELIBERATE INDIFFERENCE OF DR. ROHRER

The Estate contends that Dr. Rohrer knew that Rice required inpatient psychiatric care and was deliberately indifferent to Rice's need for such care in failing to

obtain it for him. Rohrer knew that Rice's condition was declining: His notes reflect his knowledge of Rice's weight loss, Rice's refusal to take his medications, his unwillingness to communicate, and his otherwise psychotic behavior. On three separate occasions he petitioned for Rice's involuntary commitment to a psychiatric facility, observing on the third occasion in October 2004 that Rice was in peril of dying. Yet, after Dr. Ceniceros at Oaklawn returned Rice to the jail within twenty-four hours in the first two instances, concluding that Rice did not meet the criteria for involuntary commitment and likely was malingering, Rohrer simply acceded to Ceniceros' assessment and took no further action. In the third instance, Rohrer sought Rice's admission to a different facility (Elkhart General), which refused the admission in the mistaken belief that it did not have a contract with the jail to treat inmates. Rice was then taken to Goshen Hospital, where he was declared medically stable and returned to the jail after Ceniceros refused his admission to Oaklawn. When, two months later, Rice was found incompetent to stand trial, he was designated for admission to Logansport State Hospital, which put him on a waiting list. In the view of one of the defense experts, Dr. Daniel Scherb, there was a meritorious argument that Rohrer should have considered securing a court order authorizing Rice to be forcibly medicated and fed by means of a feeding tube. Although Scherb did not believe that Rice's refusal to eat and take medication factored into his death, he acknowledged the possibility that had Rice been medicated, he might not have experienced the psychogenic

polydipsia that ultimately resulted in his death. Estate experts opined more affirmatively that had Rice been involuntarily medicated, he would not have died. Thus, in the Estate's view, Rohrer may be found liable for failing to prescribe an effective course of treatment—including involuntary admission to a psychiatric facility and/or forced medication—to prevent Rice's death.

As with the Estate's claims against the CMS nurses and the jail's staff, the district court rejected this claim for want of proof that Rohrer was deliberately indifferent to Rice's condition. Again, the court emphasized that Rice's medical needs had not been ignored. 2009 WL 1748059, at *26. Rohrer, like the other medical defendants, was aware of Rice's schizophrenia and took steps to treat it: He visited Rice regularly, monitored his condition between visits, prescribed psychotropic medication subject to Rice's willingness to take it, and petitioned for his commitment to inpatient facilities on three separate occasions. *Id.*, at *25. Although Rohrer saw Rice only once in late 2004 following Rice's return to the jail from Goshen Hospital, he did instruct the nurses to ask Rice weekly whether he would resume his medications; he knew that Rice was eating some food; and the Estate presented no evidence that any particular psychiatric care, other than forced medication, would have improved his medical condition. *Id.* Second, the court pointed out that Rice enjoyed both a right under Indiana statutory law to refuse medical treatment as well as a significant liberty interest recognized by the Supreme Court in *Washington v. Harper*, *supra*, 494 U.S. 210, 110 S. Ct. 1028, in avoiding unwanted anti-psychotic

drugs. *Id.* Rice could not be forcibly medicated without affording him procedural protections, which among other things entailed a proof of an overriding justification for involuntary medication along with a finding that the drugs were medically appropriate. *Id.* Where, as in this case, a doctor's obligation to address his patient's serious medical needs conflicts with the patient's right to refuse treatment, the proper resolution of the conflict implicates the physician's medical judgment. *Id.*, at *25-*26. Third, because Rice had not experienced compulsive water drinking prior to the night he died, his death as a result of psychogenic polydipsia, hyponatremia, and cardiac arrhythmia was not reasonably foreseeable to Rohrer. *Id.*, at *26. Finally, assuming, consistent with the criticisms of Rice's care expressed by the Estate's experts, that Rohrer could have done more to treat Rice's schizophrenia, a jury still lacked any basis on which to find that Rohrer was guilty of deliberate indifference to Rice's serious medical needs. *Id.*

We view it as a somewhat closer question than others whether Rohrer was entitled to summary judgment. In resolving the claims against the jail staff, we have stressed that they could justifiably rely on the judgment of the medical professionals, and we have similarly observed that the nurses were entitled to rely on the judgment of the physicians. Rohrer was the medical professional who was responsible for making decisions as to how Rice's schizophrenia should be treated. To the extent that Rice's condition demanded inpatient care, forced medication, or forced nutrition, Rohrer was the

physician in a position to pursue such care on Rice's behalf. In fact, Rohrer did seek Rice's involuntary admission to Oaklawn for seventy-two hours for forced medication as well as observation on two occasions, only to have Ceniceros conclude that Rice was malingering and order him returned to the jail within twenty-four hours. Yet, it is undisputed that Rohrer had the ability to have Rice admitted to another facility, which is what he tried to do in October 2004, only to run into Elkhart General's mistaken belief that it had no contract with the jail and Ceniceros' refusal to admit him at Oaklawn when Dr. Mathew explored that possibility with him. The Estate contends that had Rohrer sought Rice's admission to another facility sooner than he did, or alternatively sought authority to medicate Rice involuntarily at the jail (assuming that was possible), then the odds of Rice engaging in compulsive water drinking, and experiencing the fatal complications of that polydipsia, might have been reduced, as Dr. Scherb theorized. Granting it the benefit of those inferences, the Estate has shown a plausible nexus between Rohrer's treatment decisions and Rice's death.

But ultimately we agree with the district court that the Estate has made at most a case for negligence on the part of Dr. Rohrer. On this record, no reasonable factfinder could characterize Rohrer's treatment decisions as being deliberately indifferent to Rice's serious medical needs, or, put another way, that his decisions represented "'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] actually did not base the

decision[s] on such a judgment.' " *Collignon v. Milwaukee County*, *supra*, 163 F.3d at 989 (quoting *Youngberg v. Romeo*, *supra*, 457 U.S. at 323, 102 S. Ct. at 2462); *see also id.* at 988-89 (discussing professional judgment standard as a variant of Eighth Amendment deliberate indifference standard and noting there is little difference between the two). As the district court rightly noted, Rice had a statutory and a constitutional right, provided he did not pose a danger to himself or others, to refuse the very medications that might have mitigated the symptoms of his schizophrenia and lessened the odds of him experiencing psychogenic polydipsia. *See Harper*, 494 U.S. at 221-22, 110 S. Ct. at 1036-37 (1990); Ind. Stat. 12-27-5-1, 12-27-5-2 (formerly Ind. Stat. 16-14-1.6-7); *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 647-48 (Ind. 1987); *see also Sanville v. McCaughtry, supra*, 266 F.3d at 736. Rohrer was aware that Rice's unwillingness to take his prescribed anti-psychotic medications was adversely affecting his mental and physical health, and for that very reason he did try, on three separate occasions, to have Rice involuntarily committed for treatment. But as it turned out, Rohrer's colleague, Ceniceros, concluded that Rice was not psychotic and likely malingering and had him returned to the jail on the first two occasions and refused his admission outright in the third instance after Elkhart General turned Rice away and Goshen's Dr. Mathew spoke to him about the possibility of his admission to Oaklawn. Ceniceros, unlike Rohrer, was board-certified in psychiatry. Even if we assume that it was imprudent for Rohrer to accept Ceniceros' assessment, no evidence supports an inference that Rohrer

was consciously disregarding a risk to Rice's well-being. Rohrer believed that involuntary, inpatient treatment was warranted, but his colleague found no need for it. By October 2004, when Rohrer concluded that Rice's life was in danger, it was obviously clear to Rohrer that medical intervention was required notwithstanding what Ceniceros may have thought—thus Rohrer's decision to seek Rice's admission to a facility other than Oaklawn. Despite the failure of that effort, Rice was declared medically stable by the physicians at Goshen Hospital and returned to the jail with a directive that his diet be supplemented. After that, his weight loss, which was one of the major reasons Rohrer had sought his hospitalization, ceased. And once Rice was declared incompetent to stand trial in December, he was on a waiting list for admission to Logansport. Given the stabilization of Rice's weight, there is nothing in the record suggesting that Rohrer was aware of a serious risk to Rice's life, and certainly there was no warning that Rice might experience the psychogenic polydipsia that led to his death. We assume, as the district court did, that Rohrer and the other medical professionals at the jail could have done more generally to monitor Rice's condition and could have tried sooner and more forcefully to have his schizophrenia treated involuntarily. Perhaps a factfinder could find that Rohrer breached the duty of care he owed to Rice by failing to do more than he did to monitor and treat Rice's mental illness. Some of the gaps in time between Rohrer's visits to Rice, and in particular the fact that Rohrer only saw Rice once following his return to the jail in October 2004, are troubling

given Rohrer's own concern that Rice's condition was declining. But the Estate has not shown how any such omissions harmed Rice, and we cannot characterize any omission on his part as deliberate indifference to Rice's medical needs.

Earlier in this opinion, we expressed our doubts as to the district court's conclusion that Ceniceros did not qualify as a state actor. The district court never proceeded beyond that threshold question, but assuming that Ceniceros was a state actor, we believe that he would still be entitled to summary judgment on grounds similar to those we have just articulated as to Rohrer. Ceniceros was obviously much more removed from Rice's day-to-day condition than Rohrer was. Indeed, on the occasions that Ceniceros observed Rice first-hand, Rice behaved far differently than he did at the jail, which was what led Ceniceros to conclude that Rice was not in need of inpatient treatment and/or forced medication. But even if Ceniceros is charged with Rohrer's knowledge, the claim against Ceniceros is not strong enough to survive summary judgment. The best argument that can be made against Ceniceros is that, knowing of the concerns that twice led Rohrer to seek Rice's commitment to Oaklawn, he should not so hastily have discharged Rice from Oaklawn on the two occasions Rice was sent there, and he should not have refused Rice's admission in October 2004 when Dr. Mathew at Goshen consulted with him on the need for inpatient psychiatric care. Although we view this question too as closer than others in this case, given the non-psychotic behavior that Rice had displayed at Oaklawn,

we do not believe that a reasonable factfinder could conclude that Ceniceros was deliberately indifferent as opposed to negligent (at worst) in discounting the possibility that Rice was so seriously mentally ill as to need inpatient care and forcible medication. There is evidence that the malingering Ceniceros perceived itself could have been due to Rice's schizophrenia (Dr. Yoder, the Oaklawn psychologist who evaluated Rice's competency in April 2004, so opined), but there is no real dispute that Rice did exhibit signs of manipulative behavior, and whether this behavior was due to Rice's illness or simply to his desire to get out of jail was a matter on which reasonable professionals could (and did) disagree. That point aside, Ceniceros, like Rohrer, had no warning that Rice might experience compulsive water drinking, and therefore did not consciously disregard the circumstances that led to Rice's death.

## J.   STATE CLAIMS

As we noted earlier in our factual summary, after granting summary judgment in favor of the defendants on all of the federal claims, Judge Miller relinquished jurisdiction over the Estate's state-law claims for wrongful death (which included claims of negligence, gross negligence, and wilful and wanton misconduct) once he determined that the Estate had not properly alleged the existence of diversity jurisdiction over those claims (and concluding that diversity appeared to be lacking). 2009 WL 1748059, at *27. The Estate then narrowed the list of defendants named in its state-law claims

to citizens of states other than Michigan (of which the Estate is a citizen) and re-filed these claims against the CMS defendants alone in federal court, expressly invoking the court's diversity jurisdiction. The new suit was assigned to Judge Lozano, who dismissed the claims on the basis of collateral estoppel.

The linchpin of the collateral estoppel ruling was Judge Miller's finding, in disposing of the deliberate indifference claims, that "'it wasn't reasonably foreseeable that Mr. Rice would suffer from cardiac arrhythmia due to hyponatremia arising from Mr. Rice's ingestion of excessive amounts of water over a short period of time.'" *Estate of Rice ex rel. Rice v. Correctional Med. Servs.*, No. 09 C 319, Order at 2-3 (N.D. Ind. May 17, 2010) (quoting 2009 WL 1748059, at *26). Judge Lozano noted that in order to recover for wrongful death under Indiana law, the Estate would have to prove, inter alia, that a defendant breached a duty that he or she owed to Rice, and that the breach proximately caused an injury to Rice. *Id.* at 6. The foreseeability of an injury is a fundamental test of proximate cause. *Id.* at 6. But Judge Miller had already determined, in his summary judgment ruling on the federal claims, that Rice's death as a result of compulsive water drinking was not reasonably foreseeable. Although the legal theory underlying the federal claims (deliberate indifference) differed from that underlying the state claims (negligence), the specific issue of foreseeability did not differ. *Id.* at 7-9. In order to prevail on its state claims, the Estate would inevitably have to prove that death as a result of psychogenic polydipsia was a foreseeable risk to Rice that the CMS

defendants had a duty to guard against. *Id.* at 9-10. Judge Miller unequivocally determined that Rice's death by water ingestion was *not* reasonably foreseeable. *Id.* at 10. Given that the parties had spent three years litigating the case, including the foreseeability of Rice's death, in the litigation before Judge Miller, the Estate had enjoyed a full and fair opportunity to litigate that issue. *Id.* at 10-11. Judge Miller's finding on this point was thus entitled to collateral estoppel effect, barring the Estate from relitigating the question in the context of its state claims.

The Estate contends that it is inequitable to give Judge Miller's finding as to the foreseeability of Rice's death preclusive effect as to the state claims. Because the federal claims of deliberate indifference are governed by a distinct standard, and because Judge Miller in recognition of the difference expressly abstained from addressing the possibility that any of the defendants, including the CMS defendants, were negligent, it would be unfair to dispose of the state claims on the basis of his foreseeability finding.

We agree that Judge Miller's finding as to foreseeability should not be given preclusive effect, because it was unnecessary for him to resolve the issue of foreseeability in order to dispose of the Estate's deliberate indifference claims. Because Judge Miller's decision was a federal judgment, we look to federal common law for the criteria governing preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S. Ct. 2161, 2171 (2008); *Firishchak v. Holder*, 636 F.3d 305, 308 (7th Cir. 2011), *cert. denied*, 2012 WL 538406

(U.S. Feb. 21, 2012). For a federal court's ruling on a particular issue to be given preclusive effect, that issue must have been both actually and necessarily decided in the prior action. *Id.*; *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 & comment h (1982) (prior determination of issue must have been, inter alia, "essential to the judgment"). No one disputes that Judge Miller actually decided that Rice's death due to psychogenic polydipsia was not reasonably foreseeable to the CMS defendants (among others), but the pertinent question is whether it was necessary for him to decide that question. The Estate is on the right track when it emphasizes the material differences between the federal claims of deliberate indifference and the state claims of negligence. Such differences do not, in and of themselves, prevent an invocation of collateral estoppel, as Judge Lozano quite rightly pointed out. *E.g., Taylor*, 553 U.S. at 892, 128 S. Ct. at 2171 (citing *New Hampshire v. Maine*, 532 U.S. 742, 748-49, 121 S. Ct. 1808, 1814 (2001)). But such distinctions do shed light on whether it was necessary for the court in prior litigation to reach a particular issue. In order for the Estate to succeed on its claim that the medical defendants were deliberately indifferent to Rice's serious medical needs, it was necessary to show that the defendants consciously disregarded a *known* risk, not merely a reasonably foreseeable risk, to Rice's safety and well-being. *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009), and *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003), both citing *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002). Although the parties before Judge Miller spent a fair amount of time

talking about whether it was foreseeable to the medical defendants that Rice might suffer a bout of psychogenic polydipsia, the relevant question was whether they knew Rice was at risk for polydipsia yet consciously disregarded the risk (the subjective inquiry called for by the deliberate indifference standard) rather than whether the risk was reasonably foreseeable to them (which is the objective inquiry that typifies negligence cases). *See Knight*, 590 F.3d at 463. Thus, when Judge Miller concluded that none of the medical defendants were deliberately indifferent to the possibility that Rice might experience psychogenic polydipsia, he was necessarily finding that they were not subjectively aware of this risk and in turn did not consciously disregard it. And that was all that he needed to find. His broader observation that Rice's compulsive water drinking, and in turn the possibility that he might die from it, were not reasonably foreseeable to these defendants was unnecessary to his ruling on the deliberate indifference claims. In the words of the Restatement, his finding as to foreseeability was "not essential to the judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27 & comment h. *See*, *e.g.*, *George E. Hoffman & Sons, Inc. v. Int'l Brotherhood of Teamsters*, 617 F.2d 1234, 1246 n.31 (7th Cir. 1980); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 413-14 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 2097 (2011); *Ass'n of Bituminous Contractors, Inc. v. Andrus*, 581 F.2d 853, 860 (D.C. Cir. 1978).

There are, at the same time, unmistakable hints elsewhere in Judge Miller's opinion that he did not intend

to make any ruling that would preclude the Estate's state-law claims. In particular, the judge expressly stated that he was not speaking to the possibility that the medical defendants (including, of course, the CMS defendants) may have been negligent. 2009 WL 1748059, at *24 ("the Estate's state law malpractice claims remain, so no discussion is appropriate as to whether the medical care provided by the defendants fell below the applicable standard of care under Indiana law"); *id.*, at *23 ("Deliberate indifference is not medical malpractice . . . .") (internal quotation marks and citations omitted). We are confident that had he been asked whether he meant to render a finding on the foreseeability of psychogenic polydipsia that would be preclusive as to the Estate's state-law claims, the judge would have answered that he did not. *See id.*, at *27.

We therefore conclude that Judge Miller's finding as to the foreseeability of Rice's polydipsia should not be accorded preclusive effect as to the state-law claims. No other basis for affirming the dismissal of those claims has been argued to us. Consequently, those claims will be remanded to the district court for further proceedings. It may make sense to consolidate the litigation over those claims with what remains of the federal suit before Judge Miller. As the substance of the state claims has not yet been addressed by the district court and has not been argued in this court, nothing we have said in this opinion should be construed as speaking to the merits of those claims.

### III.

For the foregoing reasons, in No. 09-2804, we affirm in part and reverse in part the district court's entry of summary judgment in favor of the defendants, and in No. 10-2389, we reverse the district court's decision to dismiss on the basis of collateral estoppel. We remand both cases to the district court for further proceedings consistent with this opinion.